**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LUIS ENRIQUE SANCHEZ, AKA
Enrique Cruz Sanchez, AKA Luis
Llamas Sanchez, AKA Luis Charles
Sanchez, AKA Enrique Sanchez
Cruz, AKA Luis Enrique Sanchez
Llamas,

*Petitioner*,

v.

JEFFERSON B. SESSIONS III, Attorney
General,

*Respondent.*

No. 14-71768

Agency No.
A076-359-028

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted March 8, 2017
Pasadena, California

Filed August 30, 2017

Before: Harry Pregerson, Richard A. Paez,
and Morgan B. Christen, Circuit Judges.

Opinion by Judge Pregerson;
Concurrence by Judge Pregerson;
Concurrence by Judge Christen

# SUMMARY[*]

## Immigration

The panel granted, reversed, and remanded Luis Enrique Sanchez's petition for review of the Board of Immigration Appeals' decision affirming an immigration judge's decision denying Sanchez's motion to suppress evidence of his alienage and ordering his removal.

The panel held that Coast Guard officers who detained Sanchez committed an egregious Fourth Amendment violation because they seized Sanchez based on his Latino ethnicity alone. Accordingly, the panel held that the immigration judge erred in failing to suppress the Form I-213 (Record of Deportable/Inadmissible Alien), which was prepared after his immigration arrest and which the Government introduced to establish Sanchez's alienage and entry without inspection. The panel also concluded that Sanchez was not seized at the United States border, where Fourth Amendment protections are lower.

The panel further held that, because Coast Guard officers detained Sanchez solely on the basis of his Latino ethnicity, the officers violated an immigration regulation, 8 C.F.R. § 287.8(b)(2), which provides that an immigration officer may briefly detain an individual only if the officer has "reasonable suspicion, based on specific articulable facts" that the person is engaged in an offense or is an alien illegally in the United States. Accordingly, the panel held that Sanchez's removal proceedings must be terminated based on

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the regulatory violation because the regulation is designed to benefit Sanchez, and Sanchez was prejudiced by the violation.

Because the panel concluded Sanchez's proceedings should have been terminated based on the regulatory violation, the panel did not reach the question whether Sanchez's previously-submitted Family Unity Benefits and Employment applications, which the Government also introduced to establish alienage, are indirect fruits of the poisonous tree. The panel granted Sanchez's petition for review and remanded to the Board with instructions to terminate Sanchez's removal proceedings.

Concurring, Judge Pregerson wrote separately to explain why it is unfair for the Government to encourage noncitizens to apply for immigration relief, and later use statements in those relief applications against them in removal proceedings. Judge Pregerson expressed concern about the Government's argument that the exclusionary rule does not apply to Sanchez's Family Unity Benefits and Employment Authorization applications because they predated the egregious constitutional violation. He wrote that categorically exempting pre-existing applications from the exclusionary rule in this way allows law enforcement to unconstitutionally round up migrant-looking individuals, elicit their names, and then search through Government databases to discover incriminating information in pre-existing immigration records.

Concurring, Judge Christen agreed that the case did not concern a border stop, noting that the Coast Guard did not seize Sanchez at a port of entry and that the evidence did not show that Sanchez's boat had sailed from international waters. Judge Christen also agreed that Sanchez's removal

proceedings must be terminated based on the regulatory violation.

## COUNSEL

John Wolfgang Gehart (argued), Lourdes Barrera Haley, Elena Yampolsky, and Carlos Vellanoweth, Vellanoweth & Gehart LLP, Los Angeles, California, for Petitioner.

Tim Ramnitz (argued), Attorney; Jennifer P. Levings, Senior Litigation Counsel; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

## OPINION

PREGERSON, Circuit Judge:

### INTRODUCTION

This case is about Luis Sanchez, a small boat owner, who took some friends on a fishing trip within United States territorial waters, and ended up in removal proceedings before an immigration judge ("IJ") under section 240 of the Immigration and Nationality Act, 8 U.S.C. § 1229a.

Here is what happened: Sanchez's small boat was dead in the water because of engine failure near Channel Islands Harbor in Oxnard, California. His friend issued a distress call, and responding United States Coast Guard officers towed Sanchez's boat into Channel Islands Harbor, a private recreational harbor. When they arrived at Channel Islands Harbor, eight Coast Guard officers were waiting for Sanchez and his companions. The Coast Guard officers immediately

detained, frisked, and arrested Sanchez and his companions. The Coast Guard officers contacted Customs and Border Protection because the officers suspected that Sanchez and his companions were "undocumented worker[] aliens." Sanchez was then placed in removal proceedings. The matter before us is limited to Sanchez's removal proceedings.

During removal proceedings before the IJ, the Government sought to establish Sanchez's alienage and his entry into the United States without inspection by introducing: (1) a Form I-213 (Record of Deportable/Inadmissible Alien) that was prepared by a Customs and Border Protection officer after Sanchez's immigration arrest and (2) Sanchez's Family Unity Benefits and Employment Authorization applications.

At the removal hearing before the IJ, Sanchez moved to suppress the Form I-213 and the Family Unity Benefits and Employment Authorization applications as the fruits of an egregious Fourth Amendment violation. Sanchez argued that the Coast Guard officers egregiously violated his Fourth Amendment rights by detaining him based on his Latino ethnicity alone. The IJ denied Sanchez's motion to suppress and ordered Sanchez removed to Mexico. The Board of Immigration Appeals ("BIA") affirmed. This Petition for Review timely followed.

We grant Sanchez's Petition for Review. We conclude that the Coast Guard officers committed an egregious Fourth Amendment violation and violated an immigration regulation because they seized Sanchez based on his Latino ethnicity alone. Thus, we hold that the IJ erred in failing to suppress the Form I-213, but do not reach the question of the Family Unity Benefits and Employment Authorization applications. Additionally, because Sanchez has shown that

the Government violated its own regulation that is designed to benefit Sanchez, and that Sanchez was prejudiced by the violation, we hold that Sanchez's removal proceedings must be terminated.

## FACTUAL BACKGROUND

*Luis Enrique Sanchez's Immigration History*

Luis Enrique Sanchez is forty-five years old. He was born in, and is a citizen of, Mexico. He entered the United States without inspection in March 1988 when he was seventeen years old. For the last three decades – most of his life – he has lived in Ventura County, California.

On May 11, 2004, Sanchez submitted Family Unity Benefits and Employment Authorization applications to the United States Citizenship and Immigration Service ("USCIS"). USCIS granted Sanchez Family Unity Benefits, which granted him authorization to reside and work in the country, through his father.[1] Sanchez's Benefits expired on May 11, 2006. Sanchez applied for an extension of his Benefits on December 2, 2008. However, on May 28, 2009, USCIS denied Sanchez's applications because Sanchez had three misdemeanor convictions for violations of California's Vehicle Code, and was therefore ineligible for Family Unity Benefits.[2] 8 C.F.R. § 236.13(b).

---

[1] Sanchez qualified for Family Unity Benefits through his father because he was the unmarried child of his father, who had obtained lawful status as a Special Agricultural Worker. 8 C.F.R. § 236.12.

[2] On September 16, 1993, Sanchez was convicted of violating California Vehicle Code § 23109(c) (exhibition of speed on a highway), § 12500(a) (driving without a license), and § 40508(b) (failing to pay

*Fishing Trip and Immigration Arrest*

On February 25, 2010, Sanchez, two adult Latino friends, and one of the friend's 14-month-old son took a fishing trip. Using Sanchez's small pleasure boat, they departed from the Channel Islands Harbor, a recreational harbor near Port Hueneme in Oxnard, California. Sanchez declared that he and his companions did not travel outside United States territorial waters; indeed, that they did not travel more than two or three miles from the harbor. *See* Nat'l Oceanic & Atmospheric Admin., *U.S. Maritime Limits and Boundaries*, https://www.nauticalcharts.noaa.gov/csdl/ mbound.htm (Sept. 13, 2013) (describing that territorial waters extend to 12 nautical miles).

About thirty minutes into the fishing trip, the small boat's engines lost power and the boat was dead in the water. One of Sanchez's friends on the boat called 911 to request a tow back to the recreational harbor. The U.S. Coast Guard (the "Coast Guard") responded. Upon reaching the boat, the Coast Guard officers towed Sanchez's boat back to Channel Islands Harbor.

Upon arriving at Channel Islands Harbor around 5:00 p.m., approximately eight Coast Guard officers were waiting onshore for Sanchez and his companions. Once Sanchez and his companions disembarked the boat, the Coast Guard officers immediately detained and frisked them. The Coast Guard officers demanded that Sanchez and his

court fine). On September 27, 1995, Sanchez was convicted of violating California Vehicle Code § 20002(a) (failing to stop after a vehicular accident). On February 8, 2008, Sanchez was convicted of violating California Vehicle Code § 12500(a) (driving without a license).

companions hand over their identifications and belongings. Sanchez handed his driver's license to a Coast Guard officer.

The Coast Guard officers told Sanchez and his companions that they were not allowed to leave. When Sanchez asked why the group was not allowed to leave, a Coast Guard officer told Sanchez not to ask any questions and to wait for someone else to speak with him. Sanchez testified that the Coast Guard officers asked him only two questions, which he answered: (1) what is your name? and (2) where do you live?

A Coast Guard officer could not "establish positive identity or nationality" of Sanchez.[3] Without any other information, the Coast Guard officers notified U.S. Customs and Border Protection to report "the possibility of 4 undocumented worker[] aliens."[4]

About two hours later, Customs and Border Protection officers arrived at Channel Islands Harbor and detained the men for two more hours, during which time someone arrived to pick up the infant. Customs and Border Protection officers then transported Sanchez and the two adult Latino males to a Customs and Border Protection facility. The

---

[3] According to the U.S. Customs and Border Protection Form I-213 prepared after Sanchez's arrest, the following Government computer databases were searched using Sanchez's information, and all of them returned "negative" results: the Automated Fingerprint Identification System; the Consular Consolidated Database; the National Crime Information Center; and the Treasury Enforcement Communications System.

[4] There is no indication that Coast Guard officers searched Sanchez's boat. It is undisputed that neither the boat nor the passengers carried contraband.

Customs and Border Protection officers detained and interrogated Sanchez, strip searched him, and retained his identification and wallet. Through this questioning, Customs and Border Protection officers obtained information about Sanchez's alienage and entry into the United States. Customs and Border Protection released Sanchez later that night.

Customs and Border Protection Officer Carlos Rubio prepared a Form I-213 (Record of Deportable/Inadmissible Alien)[5] for Sanchez. The Form I-213 included Sanchez's admission that he was undocumented and had entered the United States without inspection. The Form I-213 also stated that the Coast Guard officers suspected that Sanchez was an "undocumented worker[] alien[]," detained Sanchez, and thereafter contacted Customs and Border Protection.

## PROCEDURAL BACKGROUND

Nine months after the fishing trip, on November 10, 2010, the United States Department of Homeland Security served Sanchez with a Notice to Appear for removal proceedings. The Government charged Sanchez as removable. On December 27, 2011, Sanchez appeared with counsel before an immigration judge ("IJ") and denied the charges of removability.

---

[5] A "Form I-213 is essentially a recorded recollection of a[n immigration official's] conversation with a [noncitizen]." *Bustos Torres v. I.N.S.*, 898 F.2d 1053, 1056 (5th Cir. 1990). It is created by an immigration official "with biographical information about a noncitizen. . . . It is generally created during the questioning of a noncitizen to obtain information to place him in removal proceedings." *Immigration Trial Handbook*, § 7:12: Form I-213 (July 2016 Update).

At the removal hearing before the IJ, the Government established Sanchez's alienage and that he entered the country without inspection by submitting the following documents: (1) the Form I-213 prepared by Customs and Border Protection officer Rubio; and (2) Sanchez's Family Unity Benefits and Employment Authorization applications.

Sanchez filed a motion to suppress these documents and to terminate proceedings. He argued that the documents should be suppressed because the Government obtained and produced those documents in violation of his Fourth Amendment rights when they seized and detained him solely on the basis of his Latino appearance.[6] Sanchez argued that if his motion to suppress were granted, the IJ must terminate proceedings. The IJ denied Sanchez's motion to suppress and ordered Sanchez removed to Mexico.

Sanchez appealed the IJ's decision to the BIA. Sanchez again argued that the Coast Guard officers racially targeted him because of his Latino ethnicity. On May 27, 2014, the BIA affirmed the IJ's decision and further concluded that Sanchez's identity and "evidence of his alienage that is independently derived from a routine record search based on that identity is not suppressible."[7] This Petition for Review timely followed.

---

[6] Sanchez submitted a declaration in support of his motion to suppress. In the declaration, Sanchez recounted the events leading to his immigration arrest. Sanchez testified before the IJ in support of the motion to suppress. The IJ found Sanchez's testimony was consistent with his declaration.

[7] Here, the BIA was referring to Sanchez's Family Unity Benefits and Employment Authorization applications.

**JURISDICTION & STANDARD OF REVIEW**

We have jurisdiction under 8 U.S.C. § 1252. Where, as here, the BIA adopts the IJ's decision while adding some of its own reasoning, we review both decisions. *Lopez-Cardona v. Holder*, 662 F.3d 1110, 1111 (9th Cir. 2011). We review constitutional claims and questions of law de novo. *Id*.

**DISCUSSION**

The central issue on appeal is a constitutional and legal question: whether the evidence establishing Sanchez's alienage and his entry without inspection (*i.e.*, the Form I-213) must be suppressed as the fruits of an egregious Fourth Amendment violation. *Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012, 1016–19 (9th Cir. 2008). The exclusionary rule applies in civil removal proceedings where a noncitizen's Fourth Amendment rights are egregiously violated. *Martinez-Medina v. Holder*, 673 F.3d 1029, 1033–34 (9th Cir. 2011).

For the exclusionary rule to apply in civil removal proceedings, a noncitizen must first establish (1) a prima facie case that law enforcement violated his or her Fourth Amendment rights; and (2) that the Fourth Amendment violation was egregious. *Lopez-Rodriguez*, 536 F.3d at 1016. Once a prima facie case and egregiousness are established, the burden shifts to the Government to defend the constitutionality of its actions. *Matter of Barcenas*, 19 I.&N. Dec. 609, 611 (BIA 1988). If the Government fails to adequately defend the constitutionality of its actions, the noncitizen's motion to suppress should be granted.

Thus, to resolve whether Sanchez can suppress the Government's evidence establishing his alienage and that he

entered the country without inspection (*i.e.,* the Form I-213), we must ask a series of questions: (1) whether Sanchez was seized at the border, where Fourth Amendment protections are lower; (2) whether Sanchez established a prima facie case that the Coast Guard officers violated his Fourth Amendment rights; and, if so, (3) whether that violation was egregious.

We answer these questions below and conclude that the Coast Guard officers committed an egregious Fourth Amendment violation and violated an immigration regulation when they seized Sanchez based on his Latino ethnicity alone. The exclusionary rule therefore applies, and we hold that the Form I-213 must be suppressed because it is tainted by the underlying egregious Fourth Amendment violation. We also hold that the immigration judge erred by failing to terminate Sanchez's removal proceedings based on the Coast Guard officers' violation of an immigration regulation. We do not reach the issue whether the Family Unity Benefits and Employment Authorization applications should have been suppressed.

## I.   Was Sanchez seized at the United States border?

The Government argues that the Coast Guard officers seized Sanchez at the United States border, where Fourth Amendment protections are lower. We disagree.

Generally, "[a] border search is by its very nature reasonable under the [F]ourth [A]mendment, and requires neither a warrant, probable cause, nor even articulable suspicion." *United States v. Dobson*, 781 F.2d 1374, 1376 (9th Cir. 1986). The Fourth Amendment still applies at the border, however, and searches or seizures that implicate a person's dignity "require some level of suspicion." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004).

To determine whether the seizure was a "border stop," we must assess whether the seizure (1) occurred at a United States port of entry, *United States v. Villamonte-Marquez*, 462 U.S. 579, 589–92 (1983), or (2) took place on the high seas when reasonably certain facts suggested that the vessel sailed from international waters, *United States v. Tilton*, 534 F.2d 1363, 1366 (9th Cir. 1976).

First, Sanchez was not seized at a United States port of entry. Sanchez was seized at Channel Islands Harbor, which is not a port of entry as defined in 8 C.F.R. § 100.4 and 19 C.F.R. §§ 101.1, 101.3 (defining Port Hueneme as a United States port of entry). Rather, Channel Islands Harbor is a recreational harbor about one mile from the Port Hueneme port of entry.

Second, there is no evidence that Sanchez's boat had entered United States territorial waters from international waters. The Coast Guard officers first encountered Sanchez's boat in United States territorial waters only two miles from a recreational fishing harbor. There is nothing in the record that shows whether Sanchez's small boat came from international waters, or whether the Coast Guard asked him whether it did, and the Government has not offered any "reasonably certain" facts that suggest that Sanchez's boat traveled from international waters. *Tilton*, 534 F.2d at 1366.

We conclude that the Coast Guard officers did not seize Sanchez at the United States border. Therefore, the lower Fourth Amendment standard does not apply. Accordingly, we must determine whether Sanchez established a prima facie case that the Coast Guard officers' actions were unreasonable under the ordinary Fourth Amendment standard.

## II. Did Sanchez establish a prima facie case that the Coast Guard officers violated his Fourth Amendment rights?

Under the ordinary Fourth Amendment standard, "[w]hen an encounter between a law [enforcement officer] and another person escalates to the point where it is considered a 'seizure,' the officer must have a reasonable, articulable basis for his actions." *Orhorhaghe v. I.N.S.*, 38 F.3d 488, 494 (9th Cir. 1994).

It is well-settled that it is unreasonable for a law enforcement officer to seize a person the officer presumes is undocumented based solely on the person's appearance or name. *See id.* at 497–98 ("[A]llowing INS agents to seize and interrogate an individual simply because of his foreign-sounding name *or* his foreign-looking appearance risks allowing race or national-origin to determine who will and who will not be investigated."); *see also United States v. Brignoni-Ponce*, 422 U.S. 873, 885–86 (1975) (holding that a person's proximity to the United States-Mexico border and apparent Mexican descent was not enough to constitute reasonable suspicion).

First, Sanchez argues that immediately after he disembarked his boat, the Coast Guard officers seized him based on his Latino ethnicity alone. An encounter with law enforcement becomes a seizure when a reasonable person, considering the totality of the circumstances, would not feel "free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 438 (1991). It is undisputed that immediately upon being brought ashore, eight Coast Guard officers were waiting for Sanchez and his companions. It is further undisputed that the Coast Guard officers (1) immediately detained and frisked Sanchez, (2) demanded that Sanchez provide

identification, (3) told Sanchez that he was not free to leave until someone else questioned him, (4) instructed Sanchez not to ask questions, and (5) detained Sanchez for two hours.

Considering the totality of the circumstances, we conclude that Sanchez was seized immediately as he disembarked his boat at Channel Islands Harbor because a reasonable person in Sanchez's position would not have felt free to decline the Coast Guard officers' requests or otherwise terminate the encounter.

Second, Sanchez argues that the Coast Guard officers detained him based on his Latino ethnicity alone. When the Coast Guard officers seized Sanchez, they did not explicitly state that they seized him and his companions because they are Latinos. But the Government has not offered a satisfactory alternative explanation for the warrantless seizure.

The Government's only evidence explaining the Coast Guard officers' conduct is the Form I-213 prepared by Customs and Border Protection Officer Rubio after Sanchez's arrest. According to the Form I-213, the Coast Guard officers reported Sanchez to Customs and Border Protection because the officers suspected that Sanchez and his companions were "undocumented worker[] aliens."

On the record before us, it appears that the Coast Guard officers seized and detained Sanchez based on his Latino ethnicity alone. Accordingly, the Coast Guard officers' conduct was unreasonable. We therefore conclude that Sanchez established a prima facie case that the Coast Guard officers violated his Fourth Amendment rights.

### III.    Did the Coast Guard officers egregiously violate Sanchez's Fourth Amendment rights?

A Fourth Amendment violation alone does not trigger the exclusionary rule in civil removal proceedings:  the exclusionary rule only applies if the Government's Fourth Amendment violation is egregious.  *Lopez-Rodriguez,* 536 F.3d at 1016.  Because we conclude that Sanchez established a prima facie case that the Coast Guard officers violated his Fourth Amendment rights, we must consider whether the Coast Guard officers' conduct was egregious.

A Fourth Amendment violation is egregious if "evidence is obtained by deliberate violations of the Fourth Amendment, or by conduct a *reasonable officer should have known* is in violation of the Constitution."  *Gonzalez-Rivera v. I.N.S.*, 22 F.3d 1441, 1449 (9th Cir. 1994) (emphasis added and internal citations omitted).  We have held that a reasonable officer should have known that his or her conduct violates the Constitution if the case law clearly established that such conduct was unconstitutional.  *Id.* at 1450.

Sanchez argues that a reasonable Coast Guard officer would have known that the case law clearly established that it was unconstitutional to seize him based on his Latino ethnicity alone.  We agree.

In 1975, the Supreme Court pronounced in *Brignoni-Ponce* that "[e]ven if [the authorities] saw enough to think that the occupants were of Mexican descent, this factor alone would justify neither a reasonable belief that they were [noncitizens], nor a reasonable belief that the car concealed other [noncitizens] who were illegally in the country." 422 U.S. at 886.

In 1994, nineteen years later, this court in *Gonzalez-Rivera* held that it was an egregious constitutional violation when an officer detained an immigrant because of his ethnic appearance and other not credible reasons because case law had clearly established the unconstitutionality of seizing a person based solely on his race or ethnicity.  22 F.3d at 1449–50 ("[The stop] occurred long after the Supreme Court . . . made clear that the Constitution does not permit such stops.").  By contrast, in *Martinez-Medina*, although the plaintiffs alleged that they were detained based on their ethnic appearance, this court held that there was not an egregious violation because the sheriff seized the plaintiffs *after* he knew that the plaintiffs were not legally present in the country.  673 F.3d at 1037.

As discussed, the Coast Guard officers did not have any information other than Sanchez's Latino ethnicity when they initially seized him on suspicion of being an "undocumented worker[] alien[]."  At the time the Coast Guard officers seized Sanchez, the principle from *Brignoni-Ponce* that a detention based solely on a person's race or ethnicity is unconstitutional was clearly established as it had been on the books for 35 years.  Unlike the sheriff in *Martinez-Medina*, the Coast Guard officers did not know that Sanchez was not legally present in the country when they seized him. Because the case law clearly established that seizing a person solely based on ethnic appearance was unconstitutional, a reasonable Coast Guard officer should have known that he or she was violating the Fourth Amendment by seizing Sanchez based on his Latino ethnicity alone.

We therefore conclude that Sanchez satisfied his initial burden for suppressing the Form I-213 because he

established a prima facie that the Coast Guard officers egregiously violated his Fourth Amendment rights.

## IV.     Is the Form I-213 suppressible?

The Government introduced the Form I-213 at Sanchez's removal hearing to establish his alienage and that he entered the country without inspection.  Sanchez argues that the Form I-213 should be suppressed because it is the product of the Coast Guard officers' egregious Fourth Amendment violation.

Because we conclude that Sanchez has established a prima facie case that the Coast Guard officers egregiously violated Sanchez's Fourth Amendment rights, the burden shifts to the Government to defend the constitutionality of the Coast Guard officers' actions.  *Matter of Barcenas*, 19 I.&N. Dec. at 611.  If the Government cannot defend the Coast Guard officers' actions, then the exclusionary rule applies to all direct products of the seizure, which here would be the Form I-213.    We conclude that the Government's arguments in defense of the Coast Guard officers' unconstitutional actions lack merit.

First, the Government cites a number of cases to argue that Coast Guard officers may reasonably question persons on a vessel seeking to come ashore.  But, in those cases, the Coast Guard officers' actions were constitutional because there were suspicious circumstances that justified the search or seizure.  *See, e.g., United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1263–64 (9th Cir. 1998) (finding that the Coast Guard officers' search of a fishing boat was reasonable under the Fourth Amendment because the occupants claimed to be on a fishing trip, but lacked any fishing equipment); *see also Villamonte-Marquez*, 462 U.S. at 589–92 (finding that the Coast Guard officers'

"suspiciousless" boarding of a sailboat was constitutional because the sailboat's markings indicated that it was from Switzerland and the officers inspected the sailboat's documents at a designated port of entry to establish that the sailboat was authorized to enter the country).

These cases are clearly distinguishable from Sanchez's case because here there was a complete lack of suspicious circumstances. Sanchez was not carrying contraband, the Coast Guard officers did not ask Sanchez what he was doing at sea, and there is no evidence in the record showing that the Coast Guard officers boarded Sanchez's boat to inspect the vessel's documents. There was no reason for the Coast Guard officers to suspect that Sanchez had done anything unlawful or traveled from international waters.

Second, the Government argues that Coast Guard regulations[8] authorized the Coast Guard to seize Sanchez and board his boat. But, "no Act of Congress can authorize a violation of the Constitution." *Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973), and the Government failed to adequately defend the constitutionality of its seizure.

We therefore hold that the Form I-213, which the Government introduced to establish Sanchez's alienage and

---

[8] "The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States." 14 U.S.C. § 89(a). An Executive Order also instructs the Coast Guard to "stop and board defined vessels, when there is reason to believe that such vessels are engaged in . . . violations of United States law or. . . [t]o make inquiries of those on board, examine documents and take such actions as are necessary to establish the registry, condition and destination of the vessel and the status of those on board the vessel." Exec. Order No. 12324, 46 Fed. Red. 48, 109 (Sept. 29, 1981).

entry without inspection, must be suppressed.  We do not reach whether Sanchez's Family Unity Benefits and Employment Authorization applications are indirect fruits of the poisonous tree because, as discussed below, Sanchez's removal proceedings should have been terminated because the Government violated immigration regulations.

## V. Did the Coast Guard officers violate an immigration regulation that   is meant to protect Sanchez?  If so, was the violation prejudicial?

Sanchez argues that the Coast Guard officers violated an immigration regulation when they seized him without reasonable suspicion that he had violated any laws.[9]  We agree.

8 C.F.R. § 287.8(b)(2) provides that an immigration officer may briefly detain an individual only if the officer "has a reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States."

It is clear that the Coast Guard officers violated 8 C.F.R. § 287.8(b)(2) because they detained Sanchez solely on the basis of his Latino ethnicity, with no reasonable suspicion that criminal activity was afoot.[10]

---

[9] Because we find one regulatory violation, we need not consider whether the Coast Guard and Customs and Border Protection officers also violated the other regulations.

[10] These immigration regulations apply to the Coast Guard officers here because Coast Guard officers enforcing any law of the United States shall "be deemed to be acting as agents of the particular executive

When the Government violates its own immigration regulation, a noncitizen's deportation proceeding may be terminated, so long as (1) the regulation serves a "purpose of benefit to the [noncitizen]," and (2) the violation prejudiced the noncitizen's "interests in such a way as to affect potentially the outcome of the[] deportation proceeding." *Matter of Garcia-Flores,* 17 I. & N. Dec. 325, 328 (BIA 1980) (adopting *United States v. Calderon-Medina*, 591 F.2d 529 (9th Cir. 1979)); *see also Choyon Yon Hong v. Mukasey*, 518 F.3d 1030, 1036 (9th Cir. 2008) (applying *Garcia-Flores*'s two-prong test to evaluate whether the Government violated a regulation in an immigration case).

The immigration regulation that the Coast Guard violated here was meant to preserve Sanchez's privacy and protect him from racial profiling. *Matter of Garcia-Flores*, 17 I. & N. Dec. at 329. Requiring a warrant or reasonable suspicion, rather than allowing for detention solely on the basis of race, protects against racial stereotypes influencing law enforcement's actions. *See Gonzalez-Rivera*, 22 F.3d at 1449–50. Sanchez's interest in being free from racial profiling and unjust detention clearly fall within the regulations' purposes.

The violation of this regulation also certainly prejudiced Sanchez. "Where compliance with the regulation is mandated by the Constitution, prejudice may be presumed." *Garcia-Flores*, 17 I.&N. Dec. at 328–29. Here, compliance with the regulation requiring reasonable suspicion for detention was mandated by the Fourth Amendment.

---

department or independent establishment charged with the administration of the particular law" and "subject to all the rules and regulations promulgated by such department." 14 U.S.C. § 89(b).

Because the Government violated a regulation meant to benefit Sanchez, and because he was prejudiced by that violation, Sanchez's removal proceedings must be terminated. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954) (holding that when an agency violates its own regulations in making a given determination, that determination is invalidated); *Matter of Garcia-Flores*, 17 I. & N. Dec. at 328–29 (holding that deportation proceedings may be "invalidated" in the case of a qualifying regulatory violation); *see also Waldron v. INS*, 17 F.3d 511, 518 (2d Cir. 1994) ("[W]hen a regulation is promulgated to protect a fundamental right derived from the Constitution or a federal statute, and the INS fails to adhere to it, the challenged deportation proceeding is invalid and a remand to the agency is required.").

## CONCLUSION

For the foregoing reasons, we GRANT Sanchez's Petition for Review and REMAND to the BIA with instructions to terminate Sanchez's removal proceedings.

**PETITION FOR REVIEW GRANTED. REVERSED and REMANDED.**

---

PREGERSON, Circuit Judge, concurring:

I write separately to explain why it is unfair for the Government to encourage noncitizens to apply for immigration relief, and at a later date use statements in those relief applications against noncitizens in removal proceedings.

The Government should not be permitted to use noncitizens' applications for immigration relief to remove noncitizens from their homes and their families in our country. When the Government enacts immigration relief programs, it encourages noncitizens to apply because there are "significant social costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests." *Plyler v. Doe*, 457 U.S. 202, 220 (1982).

The Government asks noncitizens to provide personal information to receive benefits, such as driver's licenses, visas, deferred action, and work authorization. But because noncitizens are afraid that the Government could at a later date use that information against them, many are reluctant to apply. *See* Angélica Cházaro, *Challenging the "Criminal Alien" Paradigm*, 63 UCLA L. Rev. 594, 642–43 (2016) ("Coming out of the shadows to be counted and accounted for, however, while it may bring the benefits of work authorization and a social security number, involves stepping into the potential net of immigration enforcement.").

The Government's practice in this regard contradicts the principle of welcoming immigrants into our communities. This practice also contradicts President Kennedy's view that our nation's "[i]mmigration policy should be generous; it should be fair; it should be flexible." John Fitzgerald Kennedy, *A Nation of Immigrants* (1964). We should encourage, not punish, noncitizens who come out of the shadows seeking avenues to lawful status.

I am also concerned about the Government's argument that the exclusionary rule does not apply to Sanchez's Family Unity Benefits and Employment Authorization applications because they predate the egregious

constitutional violation. *See United States v. Del Toro Gudino*, 376 F.3d 997 (9th Cir. 2004).

Categorically exempting applications that predate an egregious constitutional violation from the exclusionary rule allows immigration and other law enforcement agencies to prey on migrant and working-class communities. Law enforcement officers can unconstitutionally round up migrant-looking individuals, elicit their names, and then search through Government databases to discover incriminating information in pre-existing immigration records. *See* Eda Katharine Tinto, *Policing the Immigrant Identity*, 68 Fla. L. Rev. 819, 864 (2016).

Nothing prevents law enforcement from engaging in this unfair tactic if, as the Government contends, immigration records that predate an egregious constitutional violation can never be the fruit of the poisonous tree. *See Elkins v. United States*, 364 U.S. 206, 217 (1960) ("[The] purpose [of the exclusionary rule] is . . . to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it."); *United States v. Olivares-Rangel*, 458 F.3d 1104, 1120 (10th Cir. 2006) ("[T]he deterrence purpose of the exclusionary rule would effectively be served only by excluding the very evidence sought to be obtained by the primary illegal behavior, not just the means used to obtain that evidence.").

This troubling end-around the exclusionary rule corrupts our justice system. The Government should not be allowed to flout the protections of the Fourth Amendment and then use a noncitizen's application for immigration relief against her or him. We should foster communication, not distrust, between migrant communities and law enforcement.

CHRISTEN, Circuit Judge, concurring:

I agree with the panel that this was not a border stop. The Coast Guard did not seize Sanchez at a U.S. port of entry, nor did the evidence show that Sanchez's boat had sailed from international waters. *See United States v. Villamonte-Marquez*, 462 U.S. 579, 591–93 (1983); *United States v. Tilton*, 534 F.2d 1363, 1364–66 (9th Cir. 1976).

The record shows that Sanchez provided identification when he arrived back at the port. The record also shows that the Coast Guard ran several computer searches that yielded negative results. Despite the absence of hits in these various databases, the Coast Guard's Form I-213 reflects that the reason for detaining Sanchez was that the Coast Guard "was not able to establish positive identity or nationality." But Sanchez had provided proof of his identity and the Coast Guard did not put forth evidence that it had any concern that his identification was invalid. Nor did its computer searches give reason for detaining Sanchez. In response to Sanchez's prima facie showing, the government failed to offer "specific articulable facts" justifying his detention, *see* 8 C.F.R. § 287.8(b)(2), and therefore violated an immigration regulation intended to benefit Sanchez. Because the violation was clearly prejudicial to Sanchez, *see Matter of Garcia-Flores*, 17 I. & N. Dec. 325, 328 (BIA 1980), I agree that his removal proceedings must be terminated.