**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

OSCAR MARTINEZ-MEDINA;
LADISLAO MARTINEZ-QUINTANA,
                    *Petitioners,*

            v.

ERIC H. HOLDER Jr., Attorney
General,
                    *Respondent.*

No. 06-75778

Agency Nos.
A078-739-480
A078-739-481

ORDER AND
AMENDED
OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
May 3, 2010—Portland, Oregon

Filed August 12, 2010
Amended March 11, 2011

Before: Andrew J. Kleinfeld, Carlos T. Bea, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Bea

## COUNSEL

James R. Patterson and Rose M. Kasusky (argued), San Diego, California, for the petitioners.

Jeffrey S. Bucholtz, David V. Bernal, and Jesse M. Bless (argued), U.S. Department of Justice, Washington, D.C., for the respondent.

## ORDER

The opinion filed on August 12, 2010 is amended as follows:

Page 11,548,
  Line 19          Replace <*Gonzalez*> with <*Gonzales*>

Page 11,548,
  Line 30          Delete footnote 3

Page 11,548,
Line 9

Insert new footnote 3 after the word <crime>: <This conclusion would have found additional support in the Tenth Circuit's decision in *United States v. Santana-Garcia*, 264 F.3d 1188, 1193 (10th Cir. 2001), which held that a Utah State Trooper had probable cause to arrest an alien without a warrant after the alien told the trooper he was illegally present in the United States. The Tenth Circuit's decision in *Santana-Garcia* preceded Petitioners' November 2001 detention.>

Page 11,549,
Lines 9-16

Delete <This conclusion would have found additional support in the Tenth Circuit's decision in *United States v. Santana-Garcia*, 264 F.3d 1188, 1193 (10th Cir. 2001), which held that a Utah State Trooper had probable cause to arrest an alien without a warrant after the alien told the trooper he was illegally present in the United States. The Tenth Circuit's decision in *Santana-Garcia* preceded Petitioners' November 2001 detention.>

Page 11,549,
Line 17

Insert new paragraph before paragraph beginning with <Petitioners also contend>: <Although a reasonable officer could have been confused by these statements in *Lopez-Mendoza* and *Martinez*—and for that reason, the error was not "egregious" —a close reading of those cases demonstrates that neither meant to suggest that an alien's mere unauthorized presence is itself a crime. Both cases, rather, were referenc-

ing specific criminal statutes, *see Lopez-Mendoza*, 468 U.S. at 1038 (citing 8 U.S.C. §§ 1302, 1306, 1325); *Martinez*, 831 F.2d at 828 & n.4 (citing 8 U.S.C. § 1304(e)), none of which criminalizes mere unlawful presence. Nor is there any other federal criminal statute making unlawful presence in the United States, alone, a federal crime, although an alien's willful failure to register his presence in the United States when required to do so is a crime, *see* 8 U.S.C. § 1306(a), and other criminal statutes may be applicable in a particular circumstance. Therefore, *Gonzales*'s observation that "an alien who is illegally present in the United States . . . [commits] only a civil violation," and its holding that an alien's "admission of illegal presence . . . does not, without more, provide probable cause of the criminal violation of illegal entry," always were, and remain, the law of the circuit, binding on law enforcement officers. 722 F.2d at 476-77.>

In this new paragraph, insert footnote 4 after <in a particular circumstance.>: <An alien may be unlawfully present in the United States without being criminally liable for illegal entry, 8 U.S.C. § 1325(a), or for willful failure to register, 8 U.S.C. § 1306(a), if the alien has overstayed a valid visa or otherwise remains in the country after the expiration of a period authorized by the Department of Homeland Security.>

Petitioners' petition for panel rehearing and rehearing en banc is otherwise denied. *See* Fed. R. App. P. 35, 40. No further petitions for rehearing or rehearing en banc may be filed.

**OPINION**

BEA, Circuit Judge:

A Douglas County, Oregon, deputy sheriff was told by two Mexican nationals that they were illegally present in the United States. The deputy sheriff detained them solely by verbal instruction until an Immigration officer arrived. The aliens admitted to the Immigration officer that they were illegally present in the United States, and the government initiated administrative proceedings to remove the aliens from the United States.

The aliens contend their detention by the deputy sheriff amounted to an egregious violation of their Fourth Amendment right to be free from unreasonable seizures. Based on this allegedly egregious constitutional violation, the aliens filed a motion to suppress statements they made to the Immigration officer admitting their lack of legal status to be in this country. The Board of Immigration Appeals ("BIA") denied the motion to suppress.

We agree with the BIA that there was no egregious violation of the aliens' constitutional rights. Therefore, we deny the petition for review.

## I. Background

The facts are based primarily on the testimony of Petitioners—Ladislao Martinez-Quintana and his son Oscar Martinez-Medina—at their removal hearing. On November 22, 2001, Petitioners were traveling on Interstate 5 from their home in California to Hood River, Oregon. Three other individuals were in the vehicle. At about 2:00 p.m., Petitioners' car started to overheat. They exited the interstate highway in Canyonville, Oregon, and pulled into a gas station. At the gas station, Petitioners poured water onto the engine to cool it.

About thirty minutes after Petitioners arrived at the gas station, a deputy sheriff arrived and approached their vehicle. He asked Petitioners from where they had traveled and to where they planned to travel. Because Ladislao did not speak English, his son Oscar translated. The deputy sheriff also asked to see Petitioners' identification, which they showed him. Then, the deputy sheriff asked, "do you have green cards?" Petitioners responded that they did not. Petitioners both testified that they interpreted the question about green cards to mean: are you legally present in the United States? The deputy sheriff told Petitioners that they could not leave the gas station and that he was going to call "Immigration."

While they waited for the Immigration and Naturalization Service ("INS") agent, a second police officer arrived. Petitioners were allowed to wait next to their car, but the three individuals who were traveling with Petitioners were placed in the deputy sheriff's patrol car. At one point, Ladislao needed to use the restroom, so one of the officers accompanied him while the other officer watched the rest of the group. Ladislao estimated it took an hour and a half or two hours for the INS agent to arrive.

According to Ladislao, when the INS agent—Agent Warner—arrived, he first talked to the deputy sheriff and the other officer. Then, Agent Warner took the three individuals out of the patrol car and talked with them. Petitioners were unable to hear the conversation. The conversation ended when Agent Warner put the three individuals into his van. At that point, Agent Warner approached Petitioners. Ladislao testified Agent Warner asked whether Petitioners "had documents." Oscar testified Agent Warner asked whether Petitioners "had green cards." Petitioners did not testify as to whether they responded. Without asking Petitioners any other questions, Agent Warner loaded them into his van. He did not give Petitioners a ticket or citation, nor did he tell them the reason for their "arrest."

Agent Warner was the only other witness who testified during Petitioners' removal hearing. He testified that on November 22, 2001, he received a telephone call from a Douglas County deputy sheriff. The deputy sheriff asked Agent Warner to drive to Canyonville because the deputy sheriff had some individuals in a car with whom he wanted Agent Warner to speak. The deputy sheriff did not say anything else about the individuals. Agent Warner could not remember how much time passed between his receiving the call and his leaving his office. However, he testified that it was at least a thirty minute drive from his office to Canyonville.

When Agent Warner arrived at the gas station, the deputy sheriff explained that "he had received a telephone call from the owner of the gas station and it pertained to individuals hanging around his gas station and he became nervous about them." Agent Warner could not remember all of the questions he asked Petitioners, but he was positive that he "asked them if they possessed any type of immigration documents to be legally in the country." Neither Petitioner answered "yes." Therefore, Agent Warner transported them to the border patrol station and processed them to initiate removal proceedings.

At the border patrol station, Agent Warner individually questioned Petitioners and learned their names, dates of birth, and places of birth. Based on these interviews, Agent Warner filled out a Form I-213 (Record of Deportable/Inadmissible Alien) for each Petitioner. The I-213 forms included Petitioners' admissions to being illegally present in the United States.

Petitioners were served with Notices to Appear that charged them with being subject to removal from the United States because they remained in the United States for a longer period than permitted. Petitioners filed a motion to suppress all evidence obtained in violation of their Fourth Amendment rights, which would have included the testimony of Agent Warner and the I-213 forms.

The Immigration Judge ("IJ") found all witnesses—Ladislao, Oscar, and Agent Warner—credible. The IJ also found that "[b]oth sides"—the deputy sheriff, Agent Warner, and Petitioners—understood the questions about green cards to mean: "are you here legally or illegally." The IJ concluded "the initial discussion" between the deputy sheriff and Agent Warner "did not constitute any stop or seizure." However, the IJ concluded the encounter became a seizure after the deputy sheriff asked Petitioners about their immigration status (i.e., whether they had green cards). The IJ concluded the seizure did not violate the Fourth Amendment because the deputy sheriff had probable cause to believe Petitioners were unlawfully present in the United States. Thus, the IJ denied Petitioners' motion to suppress, found Petitioners removable as charged, and granted Petitioners' request for voluntary departure.

The BIA affirmed the decision of the IJ and cited *Matter of Burbano*, 20 I. & N. Dec. 872, 874 (BIA 1994).[1] The BIA concluded Petitioners were seized only after they admitted they were aliens and failed to provide documents to show they were lawfully present in the United States. Thus, the BIA concluded Petitioners suffered no Fourth Amendment violation, "much less an 'egregious' violation." Petitioners timely filed a petition for review.

## II.   Standard of Review

"We review de novo the denial of a motion to suppress." *United States v. Crawford*, 372 F.3d 1048, 1053 (9th Cir. 2004) (en banc). We also review de novo claims of constitutional violations. *Lanuza v. Holder*, 597 F.3d 970, 972 (9th

---

[1]Where the BIA cites *Burbano* and does not express disagreement with the IJ's decision, the BIA adopts the IJ's entire decision. *Abebe v. Gonzales*, 432 F.3d 1037, 1040 (9th Cir. 2005) (en banc). Here, the BIA did not express disagreement with the IJ's decision, so we review the IJ's decision as if it were the decision of the BIA.

Cir. 2010). An IJ's "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

## III. Discussion

**[1]** The general rule in criminal proceedings is that evidence obtained in violation of a defendant's Fourth Amendment rights may not be introduced to prove the defendant's guilt. *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1040-41 (1984) (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)). We refer to this rule as the exclusionary rule. *Id.* at 1041. Generally, the exclusionary rule does not apply in civil deportation proceedings to evidence obtained in violation of the Fourth Amendment. *Id.* at 1050.[2] An exception to this rule exists where the Fourth Amendment violation is egregious. *Gonzalez-Rivera v. INS*, 22 F.3d 1441, 1448 (9th Cir. 1994). Therefore, we must deny the petition for review unless the deputy sheriff violated Petitioners' Fourth Amendment rights *and* that violation was egregious.

---

[2]In *Lopez-Mendoza*, an alien was arrested by INS agents who were checking the immigration status of workers as they arrived at work. 468 U.S. at 1036-37. An INS agent testified that he arrested the alien because the alien "had been 'very evasive,' had averted his head, turned around, and walked away when he saw [the INS agent]." *Id.* at 1037. After his arrest, the alien admitted that he had illegally entered the United States. *Id.* At his deportation hearing, the alien moved to suppress his admission on the ground that it was the fruit of an unlawful arrest. *Id.* The IJ denied the alien's motion to suppress and found him deportable. *Id.* at 1037-38. The BIA affirmed. *Id.* at 1038. We reversed and held that the evidence should have been suppressed because it was the fruit of an unlawful arrest. *Id.* The Supreme Court reversed and held that the exclusionary rule does not apply in civil deportation proceedings. *Id.* at 1050. However, a plurality of the Court noted that the exclusionary rule might apply in civil deportation proceedings to evidence obtained through "egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained." *Id.* at 1050-51 (plurality opinion).

**[2]** The initial encounter between the deputy sheriff and Petitioners did not violate Petitioners' Fourth Amendment rights because it was consensual. "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). A seizure does not occur until "a reasonable person would believe that he or she is not 'free to leave' " or "would [not] feel free to decline the officers' requests or otherwise terminate the encounter." *Id.* at 435-36. Neither the deputy sheriff's questions about Petitioners' travel plans, his request for their identification, nor his question about their immigration status transformed the encounter into a seizure. *See Muehler v. Mena*, 544 U.S. 93, 101 (2005) (holding that officers did not need reasonable suspicion to ask an individual her name, place of birth, or immigration status); *Bostick*, 501 U.S. at 434-35 (holding that officers did not need reasonable suspicion to ask questions of an individual or to ask to examine the individual's identification). A reasonable person would have felt free to walk away from the deputy sheriff or free to refuse to answer his questions and, thus, terminate the encounter.

**[3]** The encounter became a seizure when the deputy sheriff told Petitioners that they could not leave the gas station and that he was going to call "Immigration." At that point, a reasonable person would not have felt free to leave or to otherwise terminate the encounter. *See Bostick*, 501 U.S. 437. Thus, Fourth Amendment scrutiny was triggered.

However, we need not and do not decide whether the seizure violated Petitioners' Fourth Amendment rights because we conclude that, even if the seizure violated Petitioners' Fourth Amendment rights, the violation was not egregious.

**[4]** A constitutional violation is not egregious unless " 'evidence is obtained by deliberate violations of the [F]ourth [A]mendment, or by conduct a reasonable officer should have known is in violation of the Constitution.' " *Gonzalez-Rivera*, 22 F.3d at 1449 (emphasis omitted) (quoting *Adamson v.*

*C.I.R.*, 745 F.2d 541, 545 (9th Cir. 1984)). Whether a reasonable officer should have known his conduct violated the Constitution depends in part on whether the constitutional right was clearly established in the particular context at issue. *See Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012, 1018 (9th Cir. 2008) (holding that a reasonable officer should have known his warrantless entry into a home was unconstitutional because it was committed against an "unequivocal doctrinal backdrop" that prohibited such conduct); *Gonzalez-Rivera*, 22 F.3d at 1450 (holding that a reasonable officer should have known a stop based solely on a person's Hispanic appearance was unconstitutional because "the [stop] occurred long after the Supreme Court . . . made clear that the Constitution does not permit such stops").

In *Lopez-Rodriguez*, INS agents received a tip that Gastelum, an alien, was fraudulently using the birth certificate of a United States citizen. 536 F.3d at 1013. Without obtaining an arrest or search warrant, the agents went to Gastelum's house. *Id.* at 1014. They knocked on the door, and Gastelum partially opened it. *Id.* The agents pushed the door open and entered the house. *Id.* at 1016. Gastelum did not object to the agents' entry. *Id.* After Gastelum gave the agents a false name, they arrested her. *Id.* at 1014. The agents questioned Gastelum and, based on Gastelum's responses, completed a Form I-213. *Id.* During her removal proceedings, Gastelum filed a motion to suppress the I-213 form on the ground that it was the fruit of an egregious Fourth Amendment violation. *Id.* The IJ denied the motion on the ground the violation was not egregious. *Id.* at 1015. The BIA affirmed. *Id.*

**[5]** On appeal, we reversed and held the search violated Gastelum's Fourth Amendment rights because " 'the government may not show consent to enter from the defendant's failure to object to the entry.' " *Id.* at 1017 (quoting *United States v. Shaibu*, 920 F.2d 1423, 1427 (9th Cir. 1990)). The violation was egregious because "reasonable officers should have known that they were violating the Fourth Amendment in

entering Gastelum's . . . home without a warrant, consent, or exigent circumstances." *Id.* at 1018. Gastelum's failure to object to the entry did not change the analysis because, ten years prior to the conduct that gave rise to the violation, we held that " 'in the absence of a specific request by police for permission to enter a home, a defendant's failure to object to such entry is not sufficient to establish free and voluntary consent.' " *Id.* (quoting *Shaibu*, 920 F.2d at 1428). Thus, the Fourth Amendment violation was egregious because it was committed against an "unequivocal doctrinal backdrop." *Id.*

**[6]** Here, even if we assume there was a Fourth Amendment violation, there is no evidence the deputy sheriff deliberately violated the Fourth Amendment. Further, a reasonable officer would not have known he lacked probable cause to detain Petitioners because, as we explain below, the deputy sheriff, unlike the officers in *Lopez-Rodriguez*, was not acting against an unequivocal doctrinal backdrop. The law was unclear as to whether an alien's admission to being illegally present in the United States created probable cause to seize the alien for violating federal immigration law. Because of this lack of clarity in the law, there was no egregious Fourth Amendment violation.

**[7]** We have explained that "[a]lthough the lack of documentation or other admission of illegal presence may be some indication of illegal entry, it does not, without more, provide probable cause of the criminal violation of illegal entry." *Gonzales v. City of Peoria*, 722 F.2d 468, 476-77 (9th Cir. 1983), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999) (en banc). We have also explained that, unlike illegal entry, which is a criminal violation, an alien's illegal presence in the United States is only a civil violation. *Id.* at 476. But in a subsequent opinion, the Supreme Court stated that "entering or remaining unlawfully in this country is itself a crime." *Lopez-Mendoza*, 468 U.S. at 1038. Although the Court did not elaborate on what it meant to "remain[ ] unlawfully in this country," a reason-

able officer could have interpreted that statement to mean an alien's unlawful presence in this country is itself a crime.[3]

In addition, we stated in *Martinez v. Nygaard*, 831 F.2d 822, 828 (9th Cir. 1987), that "[a]n individual's admission that she is an alien, coupled with her failure to produce her green card, provides probable cause for an arrest." This language could have created some uncertainty with respect to when officers have probable cause to arrest aliens for suspected violations of federal immigration laws. Based on these passages from *Martinez* and *Lopez-Mendoza*, a reasonable officer could have concluded that an alien's illegal presence in the United States is a crime.

Although a reasonable officer could have been confused by these statements in *Lopez-Mendoza* and *Martinez*—and for that reason, the error was not "egregious"—a close reading of those cases demonstrates that neither meant to suggest that an alien's mere unauthorized presence is itself a crime. Both cases, rather, were referencing specific criminal statutes, *see Lopez-Mendoza*, 468 U.S. at 1038 (citing 8 U.S.C. §§ 1302, 1306, 1325); *Martinez*, 831 F.2d at 828 & n.4 (citing 8 U.S.C. § 1304(e)), none of which criminalizes mere unlawful presence. Nor is there any other federal criminal statute making unlawful presence in the United States, alone, a federal crime, although an alien's willful failure to register his presence in the United States when required to do so is a crime, *see* 8 U.S.C. § 1306(a), and other criminal statutes may be applicable in a particular circumstance.[4] Therefore, *Gonzales*'s obser-

---

[3]This conclusion would have found additional support in the Tenth Circuit's decision in *United States v. Santana-Garcia*, 264 F.3d 1188, 1193 (10th Cir. 2001), which held that a Utah State Trooper had probable cause to arrest an alien without a warrant after the alien told the trooper he was illegally present in the United States. The Tenth Circuit's decision in *Santana-Garcia* preceded Petitioners' November 2001 detention.

[4]An alien may be unlawfully present in the United States without being criminally liable for illegal entry, 8 U.S.C. § 1325(a), or for willful failure to register, 8 U.S.C. § 1306(a), if the alien has overstayed a valid visa or otherwise remains in the country after the expiration of a period authorized by the Department of Homeland Security.

vation that "an alien who is illegally present in the United States . . . [commits] only a civil violation," and its holding that an alien's "admission of illegal presence . . . does not, without more, provide probable cause of the criminal violation of illegal entry," always were, and remain, the law of the circuit, binding on law enforcement officers. 722 F.2d at 476-77.

**[8]** Petitioners also contend the deputy sheriff committed an egregious Fourth Amendment violation when he seized Petitioners because he should have known he lacked authority under Oregon law to detain Petitioners. Oregon prohibits state law enforcement agencies from "us[ing] agency moneys, equipment or personnel for the purpose of detecting or apprehending persons whose only violation of law is that they are persons of foreign citizenship present in the United States in violation of federal immigration laws." Or. Rev. Stat. § 181.850. But the deputy sheriff's violation of Oregon law does not constitute a violation of the Fourth Amendment and, thus, cannot be the basis for finding an egregious Fourth Amendment violation. *See Virginia v. Moore*, 553 U.S. 164, 173-74 (2008).

In *Moore*, two Virginia law enforcement officers stopped a car driven by Moore because they heard over the police radio that he was driving with a suspended license. *Id.* at 166. The officers determined Moore's license was suspended and arrested him for the misdemeanor of driving with a suspended license. *Id.* at 167. Incident to the arrest, the officers searched Moore and found that he was carrying sixteen grams of crack cocaine. *Id.* Moore was charged with possession of cocaine with the intent to distribute it in violation of state law. *Id.*

Moore filed a motion to suppress the crack cocaine on the ground that he was arrested in violation of the Fourth Amendment. *Id.* at 168. Moore contended his Fourth Amendment rights were violated because driving with a suspended license is not an arrestable offense in Virginia and, thus, the officers

lacked the authority to arrest him. *Id.* at 167. The trial court denied Moore's motion to suppress, and after a bench trial, found Moore guilty of the drug charge and sentenced him to five years' imprisonment. *Id.* at 168. The Virginia Supreme Court reversed and "reasoned that since the arresting officers should have issued Moore a citation under state law, and the Fourth Amendment does not permit search incident to citation, the [search incident to arrest] violated the Fourth Amendment." *Id.*

The United States Supreme Court reversed and held the Virginia police officers did not violate the Fourth Amendment when they arrested Moore. *Id.* at 178. As the Court explained, "warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution, and that while States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections." *Id.* at 176. The Virginia officers had probable cause to believe Moore violated state law by driving with a suspended license, so it was not unreasonable for them to arrest him. *See id.* at 177-78. Even though the officers violated state law when they arrested Moore, that state law violation did not constitute a Fourth Amendment violation. *See id.*

**[9]** Here, the deputy sheriff lacked the authority under Oregon law to apprehend Petitioners based solely on a violation of federal immigration law. *See* Or. Rev. Stat. § 181.850. We assume, without deciding, that the deputy sheriff, like the officers in *Moore*, violated state law when he apprehended the aliens without the authority to do so. But like the state law violation in *Moore*, the deputy sheriff's violation of Oregon law does not constitute a Fourth Amendment violation. Thus, even if a reasonable Oregon law enforcement officer should have known he lacked authority under his own state's law to apprehend aliens based solely on a violation of federal immigration law, that cannot serve as the basis for finding an egregious Fourth Amendment violation.

Finally, Petitioners contend the deputy sheriff committed an egregious Fourth Amendment violation because he seized Petitioners based solely on the fact they are Hispanic. *See Gonzalez-Rivera*, 22 F.3d at 1450 (holding that a border patrol agent committed an egregious Fourth Amendment violation when he stopped an alien's vehicle based solely on the alien's Hispanic appearance). This contention lacks merit. First, there is no evidence in the record to support Petitioners' claim that the deputy sheriff arrived at the gas station because Petitioners appeared Hispanic. Second, by the time the deputy sheriff had seized Petitioners, he knew they were illegally present in the United States. The initial encounter at the gas station between the deputy sheriff and Petitioners was consensual and, thus, was not a seizure. It was not until Petitioners had acknowledged their illegal presence in the United States that the deputy sheriff seized them.

## IV. Conclusion

**[10]** The deputy sheriff's detention of Petitioners while he waited for Agent Warner to arrive did not constitute an egregious violation of Petitioners' Fourth Amendment rights. Therefore, the BIA did not err when it affirmed the IJ's order that denied Petitioners' motion to suppress.

**DENIED.**