**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MIGUEL ANGEL REYNAGA
HERNANDEZ,

       *Plaintiff-Appellee*,

       v.

DERREK SKINNER, in his individual
capacity,

       *Defendant-Appellant*,

       and

PEDRO HERNANDEZ, in his individual
capacity,

       *Defendant.*

No. 19-35513

D.C. No.
1:18-cv-00040-
SPW

MIGUEL ANGEL REYNAGA HERNANDEZ,

*Plaintiff-Appellee*,

v.

PEDRO HERNANDEZ, in his individual capacity,

*Defendant-Appellant*,

and

DERREK SKINNER, in his individual capacity,

*Defendant.*

No. 19-35514

D.C. No.
1:18-cv-00040-
SPW

OPINION

Appeal from the United States District Court
for the District of Montana
Susan P. Watters, District Judge, Presiding

Argued and Submitted March 2, 2020
Portland, Oregon

Filed August 10, 2020

Before: Roger L. Wollman,[*] Ferdinand F. Fernandez,
and Richard A. Paez, Circuit Judges.

Opinion by Judge Paez

---

[*] The Honorable Roger L. Wollman, United States Circuit Judge for the U.S. Court of Appeals for the Eighth Circuit, sitting by designation.

# SUMMARY[**]

## Civil Rights

The panel affirmed the district court's order, on summary judgment, denying qualified immunity to defendants in an action brought pursuant to 42 U.S.C. § 1983 alleging that plaintiff's Fourth Amendment rights were violated when he was stopped and arrested without reasonable suspicion or probable cause.

Plaintiff was arrested after a witness in a courtroom testified that plaintiff, who had accompanied his wife to the hearing to serve as a witness, was not a legal citizen. On the basis of this statement, defendant Pedro Hernandez, the Justice of the Peace presiding over the hearing, requested that plaintiff be "picked up" by the local Sheriff's Office. Defendant, Deputy Sheriff Derrek Skinner, subsequently detained plaintiff to question him regarding his immigration status, placed plaintiff in handcuffs, searched his person, and escorted him to a patrol car outside the courthouse.

The panel first noted that, unlike illegal *entry* into the United States—which is a crime under 8 U.S.C. § 1325— illegal *presence* is not a crime. *See Martinez-Medina*, 673 F.3d 1029, 1036 (9th Cir. 2011). Therefore, "because mere unauthorized presence is not a criminal matter, suspicion of unauthorized presence alone does not give rise to an inference that criminal activity is afoot." *Melendres v. Arpaio*, 695 F.3d 990, 1001 (9th Cir. 2012). Because *Melendres* and *Martinez-Medina* controlled and defendant

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Skinner failed to demonstrate that he had a particularized and objective basis for believing criminal activity was afoot, the panel affirmed the district court's holding that Skinner violated the Fourth Amendment when he seized plaintiff by *Terry*-stopping and then arresting him without reasonable suspicion or probable cause, respectively.

The panel further held that under either the proximate or the but-for standard of causation, defendant Hernandez was an integral participant in the violation of plaintiff's constitutional rights. The panel held that plaintiff's right to be free from unlawful stops in this circumstance had been established since at least 2012, by which time both *Melendres* and *Martinez-Medina* were law of the circuit.

## COUNSEL

Levi A. Robison (argued), Melissa A. Williams, and Mark A. English, Deputy Yellowstone County Attorneys, Billings, Montana, for Defendants-Appellants.

Matt Adams (argued), Leila Kang, Aaron Korthuis, and Anne Recinos, Northwest Immigrant Rights Project, Seattle, Washington; Shahid Haque, Border Crossing Law Firm P.C., Helena, Montana; for Plaintiff-Appellee.

# OPINION

PAEZ, Circuit Judge:

In late 2017, a witness in a courtroom in Billings, Montana, testified that one of the other witnesses, Miguel Reynaga Hernandez ("Reynaga"), was "not a legal citizen." On the basis of this statement, the Justice of the Peace presiding over the hearing spoke with the local Sheriff's Office and asked that Reynaga be "picked up."

Deputy Sheriff Derrek Skinner responded to the call. Outside the courtroom, Skinner asked Reynaga for identification and questioned him regarding his immigration status in the United States. Reynaga produced an expired Mexican consular identification card but was unable to provide detailed information regarding his immigration status because he does not speak English fluently. Skinner then placed Reynaga in handcuffs, searched his person, and escorted him to a patrol car outside the courthouse. With Reynaga waiting in the back of the patrol car, Skinner ran a warrants check and, after Reynaga's record came back clean, asked Immigrations and Custom Enforcement ("ICE") if the agency had any interest in Reynaga. Reynaga was ultimately taken to an ICE facility and remained in custody for three months.

Upon his release, Reynaga sued Skinner and Pedro Hernandez, the presiding Justice of the Peace ("Hernandez"), under 42 U.S.C. § 1983 for violating his Fourth Amendment rights. On cross-motions for summary judgment, the district court denied each defendant qualified immunity and held that Reynaga's Fourth Amendment rights had been violated. Skinner and Hernandez interlocutorily appeal the court's denial of qualified immunity. We affirm.

## I.

## A.

The testimony precipitating Reynaga's arrest occurred during a hearing on a civil order of protection. Jane Reynaga Hernandez ("Jane") had filed a request for a protection order against Rachel Elizondo ("Rachel") in the Yellowstone County Justice Court in Billings, Montana. Jane's husband, plaintiff-appellee Reynaga, accompanied her to the hearing to serve as a witness.

On the morning of the hearing, Hernandez asked Reynaga and another witness to wait outside the courtroom before they testified. Rachel then took the stand. During her testimony, she stated that Reynaga was "not a legal citizen." She made a similar statement about the other witness waiting with Reynaga. She did not testify that either witness had unlawfully entered the United States nor describe their manner of entry.

At the conclusion of Rachel's testimony, Hernandez responded, "What I'm hearing here are allegations about illegal immigrant [sic]." He directed his staff, "call me a deputy. I have two illegals sitting outside. I want them picked up." Once his staff connected him to the Sheriff's Office, Hernandez requested the Office to "send me a couple of deputies. I have two illegal immigrants out in the hallway . . . they are in the hall. Get them here as quickly as possible."

After speaking on the phone with the Sheriff's Office, Hernandez denied Jane's request for an order of protection and told both Jane and Rachel that he would hold them in contempt of court and arrest them if they tried to leave the courtroom. He wanted to prevent Jane and Rachel from

leaving because he "believed that they might tell [Reynaga and the other witness] that a deputy was on the way to investigate their immigration status and they would flee."

The Sheriff's Office relayed Hernandez's request to Skinner, a deputy sheriff at the time. The Office informed Skinner that Hernandez had called regarding "two illegal immigrants outside his courtroom that he wants picked up." Skinner was dispatched to the courthouse. When he entered the courtroom, Hernandez told him, "the information I have from them two under oath, they are illegal aliens." Skinner replied he would "take care of it." Hernandez then told him, "see what happens. If you guys take them, let me know please," and advised that Skinner "may have to call immigration . . . their testimony from the witness stand is they are illegal."

Skinner stepped into the hallway outside the courtroom and asked Reynaga for identification and his immigration status. Reynaga handed Skinner an expired Mexican consulate identification card but—because Reynaga does not speak English fluently—was unable to provide detailed information regarding his immigration status. His identification card from the Mexican consulate does not indicate his immigration status, either in Mexico or in the United States.

Reynaga then tried to enter the courtroom to reach his wife, but Skinner blocked his path and handcuffed him. Skinner searched Reynaga's person and, after failing to find anything, removed Reynaga from the courthouse and placed him into a patrol car outside. While Reynaga sat handcuffed in the patrol car, Skinner ran a warrants check. There were no outstanding warrants for Reynaga. Skinner then asked the Yellowstone County Dispatch if ICE "wanted him." An ICE agent returned Skinner's call and asked Skinner to

transport Reynaga to the Yellowstone County Detention Facility.

Reynaga was placed in ICE custody. After three months of being transported between various detention facilities, the Department of Homeland Security dismissed the deportation proceeding it had commenced against Reynaga.

**B.**

After being released from detention, Reynaga filed suit under 42 U.S.C. § 1983 in the District Court of the District of Montana against Hernandez and Skinner, alleging that they violated his constitutional rights under color of state law. *See Hernandez v. Skinner*, 383 F. Supp. 3d 1077, 1082 (D. Mont. 2019). He seeks compensatory and punitive damages and a declaratory judgment that the two violated his Fourth Amendment rights. *Id.*

The parties cross-moved for summary judgment on the section 1983 claims, punitive damages, and request for declaratory relief. *Id.* The district court concluded that the material facts underlying Reynaga's Fourth Amendment claims and Hernandez's and Skinner's affirmative defense that they were entitled to qualified immunity were undisputed. *Id.* at 1082–86. The court then proceeded to the merits of those claims, holding that Skinner had violated Reynaga's constitutional rights because he lacked either reasonable suspicion or probable cause that Reynaga was involved in criminal activity, *id.* at 1083–85, and Hernandez violated Reynaga's Fourth Amendment rights because he was an "integral participant" in Skinner's unlawful actions, *id.* at 1085–86.

Relying on our caselaw holding that "illegal presence . . . does not, without more, provide probable cause of the

criminal violation of illegal entry," *id.* at 1086 (citing *Martinez-Medina v. Holder*, 673 F.3d 1029, 1036 (9th Cir. 2011)), the court held that Reynaga's Fourth Amendment rights were clearly established at the time of the alleged offense, and denied both Hernandez and Skinner qualified immunity, *id.* at 1086–87. The court did not address Reynaga's request for punitive damages because it found there were outstanding genuine issues of fact regarding Hernandez's and Skinner's intent. *Id.* at 1087–88.

Hernandez and Skinner interlocutorily appeal the court's denial of qualified immunity. They argue that the district court erred by holding that Reynaga's Fourth Amendment rights were violated by Hernandez and Skinner, Hernandez was an integral participant in Reynaga's unlawful seizure, and Reynaga's rights were clearly established at the time of the alleged offenses.

## II.

We have jurisdiction over Hernandez's and Skinner's appeals under 28 U.S.C. § 1291. An order denying a motion for summary judgment is not typically a "final decision" within the meaning of section 1291, but "that general rule does not apply when the summary judgment motion is based on a claim of qualified immunity." *Plumhoff v. Rickard*, 572 U.S. 765, 771 (2014). "[P]retrial orders denying qualified immunity generally fall within the collateral order doctrine." *Id.* at 772.

Jurisdiction in such cases is limited to "questions of law and does not extend to claims in which the determination of qualified immunity depends on disputed issues of material fact." *Jeffers v. Gomez*, 267 F.3d 895, 903 (9th Cir. 2001). We review de novo any questions of law underlying the denial of qualified immunity. *Wilkins v. City of Oakland*,

350 F.3d 949, 954 (9th Cir. 2003). Where disputed facts do exist, we determine whether the denial of qualified immunity was appropriate by evaluating the facts in the light most favorable to the non-moving party. *Jeffers*, 267 F.3d at 903.

## III.

Hernandez and Skinner present a single question on appeal: whether the district court erred in denying them qualified immunity. Reynaga brought his claims under section 1983, which confers a tort remedy upon individuals "whose constitutional rights have been violated by state officials acting 'under color of' law." *Whalen v. McMullen*, 907 F.3d 1139, 1145 (9th Cir. 2018) (quoting 42 U.S.C. § 1983). Public officials—including police officers and judges—are qualifiedly immune from suit[1] under section 1983 except where the violation should have been obvious

---

[1] Judges are also entitled to absolute immunity from damages suits. *See Supreme Court of Virginia v. Consumers Union*, 446 U.S. 719, 734–35 (1980). Absolute judicial immunity "insulates judges from charges of erroneous acts or irregular action." *Curry v. Castillo* (*In re Castillo*), 297 F.3d 940, 947 (9th Cir. 2002). A judge is not immune for "nonjudicial actions, i.e., actions not taken in the judge's judicial capacity," or for "actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Harvey v. Waldron*, 210 F.3d 1008, 1012 (9th Cir. 2000) (internal quotation marks omitted), *overruled in part on other grounds b*y *Wallace v. Kato*, 549 U.S. 384, 393–94 (2007).

However, neither here nor in the district court did Hernandez argue that he is entitled to judicial immunity. He has therefore waived any such defense. *See, e.g., Siegert v. Gilley*, 500 U.S. 226, 231 (1991) ("Qualified immunity is a defense that must be pleaded by a defendant official."); *Sablan v. Dep't of Fin.*, 856 F.2d 1317, 1321 (9th Cir. 1988) ("On appeal, the various government officials who are named in their individual capacity do not raise any claim of absolute or qualified immunity. We will therefore treat any potential claims of official immunity as waived.").

to the official because the right at issue was "clearly established." *Id*. (citing *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985)).

To determine whether an official is entitled to qualified immunity, we evaluate whether (1) the alleged facts constitute a violation of a constitutional right, and (2) the constitutional right was clearly established at the time of the violation. *Mitchell v. Washington*, 818 F.3d 436, 443 (9th Cir. 2016). We address each factor in turn.

## A.

We first consider whether the district court erred in holding, on the basis of the nondisputed material facts, that Hernandez and Skinner violated Reynaga's constitutional rights. The Fourth Amendment to the United States Constitution protects individuals against "unreasonable searches and seizures." U.S. Const. amend. IV. There are two categories of police seizures under the Fourth Amendment: *Terry* stops and full-scale arrests. *See Allen v. City of Portland*, 73 F.3d 232, 235 (9th Cir. 1995).

Under *Terry v. Ohio*, 392 U.S. 1 (1968), police officers may conduct a brief, investigative stop of an individual when they have reasonable suspicion that the "person apprehended is committing or has committed a criminal offense." *Arizona v. Johnson*, 555 U.S. 323, 326 (2009). We examine the "totality of the circumstances" to determine whether a detaining officer has a "particularized and objective basis" for suspecting criminal wrongdoing. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted). An officer cannot rely only upon generalizations that "would cast suspicion on large segments of the lawabiding population." *United States v. Manzo-Jurado*, 457 F.3d 928, 935 (9th Cir. 2006). "Seemingly innocuous behavior,"

unless combined with other circumstances indicating criminality, does not justify a *Terry* stop. *Id.*

During a *Terry* stop motivated by reasonable suspicion, the officer may ask investigatory questions, but the "scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500 (1983). A stop for the purposes of investigating unlawful immigration "usually consume[s] less than a minute and involve[s] a brief question or two." *Dunaway v. New Yor*k, 442 U.S. 200, 210–11 (1979) (internal quotation marks omitted).

The second category of police seizures are arrests. An arrest must be supported by probable cause to believe that the person being arrested has committed a crime. *See Allen*, 73 F.3d at 236 (citing *Henry v. United States*, 361 U.S. 98, 102 (1959)). Probable cause is more difficult to establish than reasonable suspicion, and is determined at the time the arrest is made. *Arvizu*, 534 U.S. at 273–74; *Allen*, 73 F.3d at 236. It must be based on "reasonably trustworthy information sufficient to warrant a prudent person in believing that the accused had committed or was committing an offense." *Allen*, 73 F.3d at 237 (internal quotation marks omitted). Like reasonable suspicion, it can "only exist in relation to criminal conduct." *Id.*

We discuss defendant Skinner's and Hernandez's actions in turn.

*Defendant Skinner*

Skinner concedes that he conducted a *Terry* stop the moment he questioned Reynaga regarding his immigration status and conducted an arrest after placing Reynaga in the police vehicle. At issue, then, is only whether Skinner had

reasonable suspicion or probable cause to conduct the stop and arrest, respectively.

### 1.  Terry *stop*

Skinner conducted a *Terry* stop when he confronted Reynaga outside the courtroom, asked him questions regarding his immigration status, and requested identification.[2]  The parties agree that at the time Skinner conducted the stop, the only relevant information available to Skinner was Hernandez's statement that he had heard sworn testimony that Reynaga was "not a legal citizen."

Unlike illegal *entry* into the United States—which is a crime under 8 U.S.C. § 1325—illegal *presence* is not a crime. *See Martinez-Medina*, 673 F.3d at 1036 (stating that there is no "federal criminal statute making unlawful presence in the United States, alone, a federal crime[.]").  A migrant who is illegally present in the United States may have committed a civil violation—by overstaying a visa, changing her student status, or acquiring prohibited employment—or a criminal violation, by entering the

---

**2** "[N]ot every encounter between a police officer" and an individual "is an intrusion requiring objective justification." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980).  A seizure under the Fourth Amendment occurs only when a reasonable person would not feel free to leave or decline the officer's requests. *See Brendlin v. California*, 551 U.S. 249, 255 (2007).  But Skinner does not dispute that he seized Reynaga when he confronted him, either here or in the district court. *See* Op. Br. 21 ("Skinner did not violate [Reynaga's] right against unreasonable searches and seizures when he detained . . . [Reynaga]. Skinner had a reasonable suspicion that [Reynaga] might have committed a crime as indicated by his presence in the United States."); *Hernandez*, 383 F. Supp. 3d at 1084 ("Deputy Skinner does not dispute he detained, or *Terry* stopped, [Reynaga] the moment he began questioning him.").

country illegally. *See Gonzales v. City of Peoria*, 722 F.2d 468, 476–77 (9th Cir. 1983), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999) (en banc); *Arizona v. United States*, 567 U.S. 387, 407 (2012) ("As a general rule, it is not a crime for a removable alien to remain present in the United States."). Therefore, "because mere unauthorized presence is not a criminal matter, suspicion of unauthorized presence alone does not give rise to an inference that criminal activity is 'afoot.'" *Melendres v. Arpaio*, 695 F.3d 990, 1001 (9th Cir. 2012) (quoting *Terry*, 392 U.S. at 30).

We held in *Melendres* that "detaining individuals based solely on reasonable suspicion or knowledge that a person was unlawfully present in the United States" is not sufficiently "premised on criminality" to justify a stop under *Terry*. 695 F.3d at 1000–01. The single statement conveyed by Hernandez regarding Reynaga's unlawful status, then, was not a sufficiently "particularized and objective basis" for Skinner to believe that Reynaga was "engaged in, or [] about to engage in, *criminal* activity[.]" *United States v. Sandoval*, 390 F.3d 1077, 1080 (9th Cir. 2004) (emphasis added); *see also Arvizu*, 534 U.S. at 273–74. Hernandez did not describe Reynaga's manner of entry nor provide additional information suggestive of criminal conduct.

In *Melendres*, Latino motorists brought a putative class action under section 1983 against a county sheriff's office, a sheriff, and other individuals, alleging that the defendants unlawfully engaged in a policy or practice of racially profiling Latino individuals in connection with vehicle stops. *See* 695 F.3d at 994–95. In reviewing the preliminary injunction entered by the district court, we concluded that the plaintiff-class was likely to succeed on the merits of its claims because the class members' Fourth Amendment

rights had been violated. *Id.* at 1001–02. Although "illegal presence may be some indication of illegal entry, unlawful presence need not result from illegal entry. For example, an individual may have entered the country lawfully, but overstayed his or her visa." *Id.* at 1001 (internal quotation marks and citation omitted). Nothing in our previous caselaw, we explained, "suggests that presence *alone* is sufficient to justify a stop by the . . . officers who are not empowered to enforce civil immigration violations." *Id.*

*Melendres* expanded upon a then-recent case, *Martinez-Medina v. Holder*, 673 F.3d 1029 (9th Cir. 2011). In *Martinez-Medina*, two immigrants admitted to a deputy sheriff that they were unlawfully present in the country. *Id.* at 1031. The officer approached the pair at a gas station and asked about their travel plans and whether they had identification and green cards. *Id.* One of the two immigrants spoke to the officer with help from his son, who acted as a translator. *Id.* Interpreting the officer's request for green cards as a question about their immigration status in the United States, the two responded that they did not have green cards. *Id.* The officer then warned them they could not leave until "Immigration" arrived. *Id.* at 1031–32.

At that point, we explained, the officer had seized the two within the meaning of the Fourth Amendment, only on suspicion that they were unlawfully present in the country. *Id.* at 1034. We held that the officer's actions did not egregiously violate the immigrants' constitutional rights, because our caselaw regarding whether law enforcement officers may draw inferences about criminality from an individual's immigration status was less than clear at the time. *Id.* at 1036–37. But we clarified that "an alien who is illegally present in the United States . . . [commits] only a civil violation," and "admission of illegal presence . . . does

not, without more, provide probable cause of the criminal violation of illegal entry." *Id.* at 1036 (internal quotation marks omitted) (alterations in original). This "always [was], and remain[ed], the law of the circuit, binding on law enforcement officers." *Id.*

Hernandez and Skinner concede at various points in their appellate briefs that *Melendres* forecloses their argument that illegal presence alone may establish reasonable suspicion. They argue only that (1) we "should overrule the holding in *Melendres* that illegal presence in the United States does not create a reasonable suspicion that the person illegally entered the United States," Op. Br. 30, and (2) they had "little experience with the enforcement of immigration law," so it was "reasonable for [them] to believe the general standard for investigatory stops would apply" to Reynaga, Op. Br. 42.

First, we cannot overrule *Melendres*. Absent intervening, controlling authority, a three-judge panel may not overrule a prior decision of this court. *See Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (en banc). Skinner and Hernandez do not point to a Supreme Court case or federal law calling *Melendres* into question.

Second, the standard for evaluating whether a Fourth Amendment violation occurred is objective, not subjective; Skinner's and Hernandez's own experiences with immigration matters are irrelevant. *Ashcroft v. al-Kidd*, 563 U.S. 731, 740 (2011) ("Efficient and evenhanded application of the law demands that we look to whether the arrest is objectively justified, rather than to the motive of the arresting officer." (footnote omitted)).

Because *Melendres* and *Martinez-Medina* control and Skinner fails to demonstrate that he had a particularized and

objective basis for believing "criminal activity [was] afoot," *Terry*, 392 U.S. at 30, we hold the district court did not err in concluding that Skinner lacked reasonable suspicion to stop Reynaga.

2. *Arrest*

Skinner concedes he did not have probable cause to arrest Reynaga until after he contacted ICE.  He instead argues that he arrested Reynaga only *after* he had spoken with the ICE agent.**[3]**  We evaluate, then, whether Reynaga was arrested within the meaning of the Fourth Amendment prior to Skinner's phone call with the ICE agent.

To determine whether a *Terry* stop has escalated into a full-blown arrest, we evaluate the severity of the intrusion, the aggressiveness of the officer's actions, and the reasonableness of the officer's methods under the circumstances.  *Washington v. Lambert*, 98 F.3d 1181, 1188–89 (9th Cir. 1996).  There is no bright-line rule.  The use of "especially intrusive means" of effecting *Terry* stops has been held permissible in certain circumstances, including:

> 1) where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; 2) where the police have information that the suspect is currently armed; 3) where the stop closely follows a violent crime; and 4) where the

---

**[3]** It is unclear what Skinner learned about Reynaga's immigration status from ICE.  The record indicates that Skinner "asked dispatch to see" if ICE "wanted" Reynaga.  An ICE agent then called Skinner and asked him to transport Reynaga to the Yellowstone County Detention Facility.

> police have information that a crime that may
> involve violence is about to occur.

*Id.* at 1189 (footnotes omitted). Handcuffing as a means of detaining an individual does not automatically escalate a stop into an arrest, but it "substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop." *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982); *see also Allen v. City of Los Angeles*, 66 F.3d 1052, 1057 (9th Cir. 1995).

At the time Skinner handcuffed Reynaga, brought him outside, and placed him into the patrol vehicle, there was no evidence suggesting that Reynaga was armed, uncooperative, dangerous, or a flight risk. Reynaga, by all accounts, fully complied with Skinner's requests, and Skinner's actions substantially aggravated the intrusiveness of his questioning. A reasonable individual in Reynaga's position would not have felt free to leave after being blocked from entering the courtroom, handcuffed, taken outside, and placed in Skinner's patrol vehicle. *See United States v. Del Vizo*, 918 F.2d 821, 824–26 (9th Cir. 1990); *see also Benitez-Mendez v. I.N.S.*, 752 F.2d 1309, 1311 (9th Cir. 1983) (holding that an individual detained in a Border Patrol vehicle while officers checked his immigration papers was seized within the meaning of the Fourth Amendment). We affirm the district court's holding that Reynaga was arrested by the time he was placed in the back of the patrol vehicle, prior to Skinner's call to ICE.

As discussed, Skinner concedes that he did not have probable cause to arrest Reynaga before speaking with the ICE agent, making the arrest unlawful. Construing the facts in the light most favorable to Reynaga, we affirm the district court's holding that Skinner violated the Fourth Amendment

when he seized Reynaga by *Terry*-stopping and arresting him without reasonable suspicion or probable cause, respectively.

*Defendant Hernandez*

The district court concluded that Hernandez seized Reynaga because he was an "integral participant" in Skinner's unlawful actions. As a predicate to section 1983 liability, each public official must integrally participate in the unlawful seizures of Reynaga. *See Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004).

We have yet to define the minimum level of involvement for liability under the integral-participant doctrine. The official's individual actions need not "themselves rise to the level of a constitutional violation," *id.*, but the official must be more than a "mere bystander[]," *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1090 (9th Cir. 2011). In *Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007), for example, we held that an officer whose actions were "instrumental" in effectuating a constitutional violation was an integral participant. *Id.* at 481 n.12. The officer handcuffed the suspect, which then allowed another officer to place hobble restraints on him. *Id.* at 480. We held that the use of hobble restraints was an excessive use of force and not justified as a matter of law, and that the handcuffing officer integrally participated in the unlawful use of those restraints. *Id.* at 469 & n.3, 478–80; *see also Keates v. Koile*, 883 F.3d 1228, 1242 (9th Cir. 2018) (holding that a complaint adequately alleged defendants were integral participants in a violation of the right to familial association because defendants "were aware of [the child's] situation . . . and participated in a meaningful way in a collective decision" to remove the child from her mother's custody).

Helpful to this analysis are the standards of causation under tort law. Constitutional violations under section 1983 are a species of tort liability. *See Carey v. Piphus*, 435 U.S. 247, 253–55 (1978); *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 727 (1999) (Scalia, J., concurring in part). Tort law measures causation by reference to two standards: proximate and but-for cause. "Proximate cause is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct." *Paroline v. United States*, 572 U.S. 434, 445 (2014). It precludes liability only "where the casual link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." *Id.* But-for causation, instead, exists where the alleged injury or result would not have occurred "but for" that conduct. *White v. Roper*, 901 F.2d 1501, 1505–06 (9th Cir. 1990).

We have not clarified whether we import both proximate cause and but-for cause into our integral-participant doctrine. *Blankenhorn* suggests that we require only but-for cause, as there was no indication that the officer who was an integral participant knew that the other officer would use hobble restraints. *See* 485 F.3d at 481 n.12. The officer who used the hobble restraints stated in a declaration that the handcuffing officer's help was "instrumental in the officers' gaining control" of the suspect, which "culminated in [the] application of hobble restraints." *Id.* In other words, but for the use of handcuffs, the officer would not have been able to apply the hobble restraints. We did not address the foreseeability of the use of restraints or the scope of risk created by using handcuffs.

Under either standard of causation, however, Hernandez was an integral participant in the violation of Reynaga's constitutional rights. The but-for standard is easily met:

Skinner would not have been present at the courthouse or questioned Reynaga but-for Hernandez's phone call. And Reynaga's unlawful stop and arrest were reasonably foreseeable consequences—or, at the very least, within the scope of risk—of Hernandez's orders. Indeed, once Hernandez learned from the witness's testimony that Reynaga was unlawfully present in the United States, he ordered his staff to contact the sheriff's office because he "want[ed] [the witnesses] picked up." Hernandez did not, as he now argues, "request[] an investigation." Op. Br. 23. After ordering that he wanted Reynaga "picked up," he then directed Reynaga's wife to remain in the courtroom so that she could not warn Reynaga of Skinner's impending arrival. Skinner told Hernandez he would "take care of it," and Hernandez offered no clarification that he preferred Skinner conduct an investigation or mere inquiry. Reynaga's detention was a reasonably foreseeable consequence—indeed, perhaps the only reasonable interpretation—of Hernandez's order that Reynaga be "picked up."

Hernandez argues that "[t]he integral participant doctrine is not based on logic," and, if we conclude Hernandez was an integral participant, we should "overturn the doctrine[.]" Reply Br. 13. As a three-judge panel, we cannot simply overrule circuit precedent. *Miller*, 335 F.3d at 899–900. Hernandez does not point to any federal law or Supreme Court case that effectively overrules the doctrine. We hold that the district court did not err in concluding that Hernandez was an integral participant in Reynaga's unlawful stop and detention.

\*   \*   \*

We affirm the district court's conclusion that, viewing the facts in the light most favorable to Reynaga, Skinner violated the Fourth Amendment by detaining and arresting

Reynaga without reasonable suspicion or probable cause, respectively, and that Hernandez was an integral participant in that unlawful conduct.

**B.**

The second prong in the qualified-immunity analysis is whether the constitutional right in question was clearly established at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (1994). The "clearly established law" that has been allegedly violated "should not be defined at a high level of generality"; it must be "particularized" to the facts of the case. *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (internal quotation marks omitted). "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Graves v. City of Coeur d'Alene*, 339 F.3d 828, 846 (9th Cir. 2003), *abrogation on other grounds recognized in OTR Wheel Eng'g, Inc. v. West Worldwide Servs., Inc.*, 897 F.3d 1008, 1016 (9th Cir. 2018).

1.  Terry *stop*

Existing precedent forecloses Skinner's and Hernandez's arguments that Reynaga's right to be free from a *Terry* stop absent reasonable suspicion was not clearly established in these circumstances. *Melendres* clearly establishes the law that governs the Fourth Amendment right implicated by Reynaga's unlawful *Terry* stop. Skinner stopped Reynaga solely on the basis of Hernandez's statement that a witness had testified that Reynaga was "not a legal citizen." *Melendres*—which was decided in 2012, almost five years before Skinner stopped Reynaga—held that "detaining individuals based solely on reasonable suspicion or knowledge that a person was unlawfully present in the United States" is not sufficiently "premised on

criminality" to be justified under *Terry*.  695 F.3d at 1000–1001.

Skinner detained Reynaga based solely on knowledge that he was unlawfully present in the United States. Reynaga's right to be free from detention absent reasonable suspicion in this context was clearly established at the time of the stop.

2. *Arrest*

Neither are Skinner and Hernandez entitled to qualified immunity for Skinner's unlawful arrest of Reynaga.  For the reasons discussed, Skinner arrested Reynaga when he handcuffed Reynaga and detained him in the patrol car.[4]

The Supreme Court and our own court long ago established an immigrant's right to be free from arrest absent probable cause that he has entered the country unlawfully. Officers may, during a justified *Terry* stop, question individuals "about their citizenship and immigration status, and . . . may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause."  *United States v. Brignoni-Ponce*, 422 U.S. 873, 881–82 (1975).

In *Gonzales v. City of Peoria*, published in 1983, we held that an individual's "lack of documentation or other

---

[4] Skinner and Hernandez also briefly argue that the district court misapplied the collective-knowledge doctrine.  They assert that because Skinner was "working in concert with ICE, the information ICE had as to probable cause for the arrest of [Reynaga] could . . . be imputed to Skinner."  Op. Br. 44.  Because we conclude Reynaga was arrested when he was handcuffed and placed in the patrol car—prior to Skinner's phone call to ICE—we do not address this doctrine.

admission of illegal presence" does not, "without more, provide probable cause of the criminal violation of illegal entry." 722 F.2d at 476–77. Arresting officials must "be able to distinguish between criminal and civil violations and the evidence pertinent to each." *Id.* at 477. We re-emphasized this in *Martinez-Medina*, explaining that an immigrant's "admission of illegal presence . . . does not, without more, provide probable cause of the criminal violation of illegal entry," which "remain[ed], the law of the circuit, binding on law enforcement officers." 673 F.3d at 1036 (quoting *Gonzales*, 722 F.2d at 476–77).

We have also stated, in varying contexts, that the other factors upon which Skinner relied to arrest Reynaga are minimally probative of the crime of illegal entry. In *Manzo-Jurado*, we held that a group of "individuals' appearance as a Hispanic work crew, inability to speak English, proximity to the border, and unsuspicious behavior"[5] did not even amount to *reasonable suspicion* of illegal entry. 457 F.3d at 940; *see also Benitez-Mendez*, 752 F.2d at 1311 (holding that an immigrant was unlawfully seized by a Border Patrol officer where the officer knew only that he "was a field worker whose co-workers fled upon sight of a marked Border Patrol detail," was an "alien," and "claimed to possess documents showing his legal status").

In *Gonzales*, we cautioned that "an arresting officer cannot assume that [a noncitizen] who admits he lacks proper documentation" committed a crime; "the lack of documentation or other admission of illegal presence may be some indication of illegal entry," but "it does not, without more, provide probable cause of the criminal violation[.]" 722 F.2d at 476–77; *see also Tatum v. City & County of San*

---

[5] 457 F.3d at 932.

*Francisco*, 441 F.3d 1090, 1094–95 (9th Cir. 2006). Likewise, an individual's language skills, without more, do not constitute probable cause. *See Brignoni-Ponce*, 422 U.S. at 886–87 (recognizing that a widespread characteristic "standing alone . . . does not justify stopping all Mexican-Americans to ask if they are aliens"); *Manzo-Jurado*, 457 F.3d at 936–37 (concluding that a lack of language skills standing alone does not even rise to the level of reasonable suspicion); *see also United States v. Rodriguez*, 976 F.2d 592, 595–96 (9th Cir. 1992) (explaining that in evaluating whether reasonable suspicion has been met, courts "must not accept what has come to appear to be a prefabricated or recycled profile of suspicious behavior very likely to sweep many ordinary citizens into a generality of suspicious appearance merely on hunch"). Together, these cases sufficiently constitute the "body of relevant case law . . . necessary to clearly establish the answer with respect to probable cause." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (internal quotation marks omitted).

Reynaga's right to be free from arrest absent probable cause that he entered the country unlawfully has been established since at least 2012, by which time we had published both *Melendres* and *Martinez-Medina*, and arguably as early as *Gonzales*, in 1983.

## IV.

We affirm the district court's denial of qualified immunity for both Skinner and Hernandez. Skinner stopped and arrested Reynaga without reasonable suspicion or probable cause, respectively, and Hernandez integrally participated in his actions. Reynaga's right to be free from unlawful stops in this circumstance has been established since at least 2012, by which time both *Melendres* and *Martinez-Medina* were law of the circuit.

**AFFIRMED.**