**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

SUSAN PECK, individually and as surviving heir and successor in interest of Paul Mono (deceased),

Plaintiff-Appellee,

and

COURTNEY MONO; WHITNEY MONO,

Plaintiffs,

v.

ANTHONY MONTOYA; MICHAEL JOHNSON; BRAD CARRINGTON; BRENT LIND; JOHN FREY,

Defendants-Appellants,

and

COUNTY OF ORANGE; SANDRA HUTCHENS, Sherriff; AARON MCFATRIDGE,

Defendants.

No.    20-56413

D.C. No.
2:19-cv-04654-DSF-AFM

OPINION

SUSAN PECK, individually and as surviving heir and successor in interest of Paul Mono (deceased),

No.    21-55411

D.C. No.
2:19-cv-04654-DSF-AFM

Plaintiff-Appellee,

and

COURTNEY MONO; WHITNEY MONO,

Plaintiffs,

v.

BRAD CARRINGTON; BRENT LIND;
JOHN FREY,

Defendants-Appellants,

and

COUNTY OF ORANGE; SANDRA
HUTCHENS, Sherriff; AARON
MCFATRIDGE; ANTHONY MONTOYA;
MICHAEL JOHNSON,

Defendants.

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted February 8, 2022
Pasadena, California

Before: Mary M. Schroeder, Richard C. Tallman, and Eric D. Miller, Circuit
Judges.

Opinion by Judge Miller;
Concurrence by Judge Schroeder

# SUMMARY[*]

## Civil Rights

The panel affirmed in part and reversed in part the district court's denial of defendants' motion for summary judgment in an action brought pursuant to 42 U.S.C. § 1983 arising from the shooting of Paul Mono by Orange County Sherriff's deputies.

Five deputies responded to a 911 call reporting that Mono was acting erratically and threatening someone with a firearm. The deputies asserted that Mono ignored their warnings, picked up a gun, and began raising it toward them. At that point, two of the deputies shot and killed Mono. Susan Peck, Mono's wife, told a different story. She claimed that eyewitness testimony and ballistics analysis proved that Mono was not moving toward the gun, never touched the gun, and did not pose an immediate threat to himself or others. Peck brought this action asserting that the deputies violated Mono's Fourth Amendment right to be free from excessive force and her own Fourteenth Amendment right to a familial relationship.

On the excessive-force claim, the panel concluded that the deputies who shot Mono were not entitled to qualified immunity. Insofar as the deputies argued that the evidence was insufficient to raise a genuine issue of fact, the panel lacked jurisdiction to resolve the factual disputes. The panel concluded that drawing all reasonable inferences in Peck's favor, a jury could conclude that defendants Montoya and Johnson fired at an unarmed man who, although in the presence of a gun, never picked it up and in fact was moving away from it when he was shot. Officers may not kill suspects simply because they are behaving erratically, nor may they kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed.

The panel next concluded that the deputies who did not shoot Mono were entitled to qualified immunity. Because defendants Frey, Lind, and Carrington did not form a plan to shoot Mono, nor did they set in motion acts by Montoya and Johnson that they knew or should have known would cause a constitutional violation, they were

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

not integral participants in the constitutional violation. The district court therefore erred in denying their motion for summary judgment on the excessive-force claim.

Turning to Peck's familial-association claim, the panel noted that whether such a claim could be asserted by a spouse, rather than a parent or child, has not been addressed by this court. Nevertheless, even under this court's case law relating to familial-association claims asserted by parents and children, Peck's claim failed because no showing of a purpose to harm had been made or even attempted. No evidence suggested that the deputies shot Mono for any other purpose than their (possibly mistaken) perception of the need for self-defense. Consequently, there was no Fourteenth Amendment violation, and the deputies were entitled to qualified immunity on this claim.

Concurring in the result, Judge Schroeder agreed with the majority's conclusion that the deputies who used deadly force were not entitled to qualified immunity and that the three deputies who did not shoot were entitled to qualified immunity because they were not integral participants in the use of excessive force. Judge Schroeder stated, however, that the majority opinion added as part of its discussion of integral participation, an unnecessary discussion of but-for causation, apparently in order to cast doubt on its applicability in this circuit. To the extent there may be an open question in this circuit about the applicability of but-for causation, the question should be answered in a case where the issue is raised. Judge Schroeder further stated that it was not for the panel to opine on what the officers may have been thinking, or what they thought they were accomplishing when they stationed themselves at the windows of Mono's house.

## COUNSEL

Jesse K. Cox (argued), Norman J. Watkins, S. Frank Harrell, and Marlena R. Mlynarska, Lynberg & Watkins, Orange, California; for Defendants-Appellants.

David C. Washington (argued), Barbara E. Hadsell, Dan Stormer, and Tanya Sukhija-Cohen, Hadsell Stormer Renick & Dai LLP, Pasadena, California; for Plaintiff-Appellee.

MILLER, Circuit Judge:

This case arises from a fatal encounter between Paul Mono and members of the Orange County Sheriff's Department. Five deputies responded to a 911 call reporting that Mono was acting erratically and threatening someone with a firearm. The deputies assert that Mono ignored their warnings, picked up a gun, and began raising it toward them. At that point, two of the deputies shot and killed Mono. Susan Peck, Mono's wife, tells a different story. She claims that eyewitness testimony and ballistics analysis prove that Mono was not moving toward the gun, never touched the gun, and did not pose an immediate threat to himself or others.

Peck sued the deputies under 42 U.S.C. § 1983, claiming that they violated Mono's Fourth Amendment right to be free from excessive force and her own Fourteenth Amendment right to a familial relationship. The district court denied the deputies' motion for summary judgment, and the deputies appeal.

On the excessive-force claim, we conclude that the deputies who shot Mono are not entitled to qualified immunity, but that the deputies who did *not* shoot him are entitled to qualified immunity. On the familial-association claim, we conclude that all of the deputies are entitled to qualified immunity. We therefore affirm in part and reverse in part.

3

# I

In 2018, Paul Mono was 65 years old and legally blind. When he and his wife, Susan Peck, bought a house in Laguna Woods, California, they decided to renovate it to accommodate his visual impairment. Their real-estate agent, Jennifer Heflin, recommended the services of Dennis Metzler, a general contractor. Metzler began work, but Mono became dissatisfied with the pace and quality of his work. Mono's relationship with Metzler deteriorated, and Heflin stepped in to serve as intermediary between the two parties.

On February 5, Heflin visited the house, and Mono and Peck told her that they wanted to review Metzler's floor plans so that they could hire a different contractor. At some point during the visit, Mono showed Heflin a gun. The next day, Heflin met Metzler in a carport near Mono's house and obtained the floor plans from Metzler to give to Mono and Peck. Metzler, concerned for Heflin's safety, tried to discourage Heflin from going to the house. Heflin agreed to call Metzler and let him listen in on what was happening in Mono's house.

After Heflin arrived at the house, Mono became angry, claiming that the floor plans Heflin provided were incorrect. When Heflin exited the house and stood outside talking to Peck, Mono came to the front door with a gun, which he waved over his head for about 30 seconds. At one point, he pointed the gun at

Heflin and threatened to shoot Metzler. She told him to put the gun down, and he went inside and returned without the gun.

Metzler, who was listening to the conversation over the phone, heard Heflin tell Mono to "put the gun down," at which point he hung up and called 911. Metzler told the dispatcher, "I've got a client that's threatening with a firearm to shoot somebody . . . in his house." Metzler went on to say that Mono was screaming that "he wants to shoot Dennis Metzler." He told the dispatcher that Heflin was inside the house and that Heflin had "told [Metzler] that she saw the firearms yesterday when she was there."

Orange County Sheriff's Deputies Anthony Montoya, Michael Johnson, John Frey, Brent Lind, and Brad Carrington responded to the 911 call. Frey was the first on the scene. He spoke briefly with Metzler, who had waited near the carport and who reported that he had called 911, that Mono had threatened to shoot him, and that he believed there was a gun in the house. Heflin was also outside the house, but Frey did not talk to her.

Once they arrived on the scene, the deputies established a perimeter around the house. Johnson, Lind, and Carrington joined Frey in taking positions on one side of the house, from which they could see inside through a large window. Montoya took up position on another side, where he could see inside through a window in the door. Mono was screaming and visibly agitated. He swore at the

officers, made obscene gestures toward them, and, at one point, lowered his pants and pressed his bare buttocks against the window. Due to his vision loss, Mono used a cane with red marks, which he began waving around while yelling statements like "Shoot me," "Kill me," and "If you come in my house, I'm going to shoot you." He also asked the deputies, "What are you going to do, shoot a blind man?"

The confrontation escalated when Montoya observed a holstered revolver lying on the couch. Montoya alerted the other deputies, and, in response, Mono began yelling, "I'll show you my gun! You wanna see my gun?" Johnson commanded Mono not to go near the gun.

The parties dispute what happened next. According to the deputies, Mono began moving toward the gun, bent over, and "reached for and grabbed onto" the gun. As soon as Mono grabbed the gun, Johnson began firing at him through the window. Montoya also began firing but says that he waited to do so until Mono raised the gun toward the other deputies. The two deputies fired independently: Neither was aware that the other had also fired. Only a few seconds elapsed between Johnson's commands not to go near the firearm and the decisions of Johnson and Montoya to open fire.

Peck tells a different version of the events. According to her, Mono never grabbed the gun. When she reached her husband after the shooting, she did not see

6

a gun in his hands or anywhere near his body; the gun was ultimately found unloaded and secured in the holster under the coffee table. Larry Berman, a neighbor who witnessed the interaction, testified that Mono was moving away from the gun several seconds before the shooting. And although Peck herself cannot recall many of the details surrounding the shooting, she points to other discrepancies in the deputies' account. For example, she notes that a ballistics expert concluded that Mono's wounds "attributed to bullets fired by Deputy Johnson do not support Deputy Johnson's version of the shooting."

After the shooting, Johnson attempted to provide medical care to Mono. Paramedics arrived soon thereafter, and Mono was pronounced dead at the scene.

Peck brought this action against the deputies under 42 U.S.C. § 1983, asserting claims of excessive force in violation of the Fourth Amendment and deprivation of a familial relationship in violation of the Fourteenth Amendment. The deputies moved for summary judgment on the basis of qualified immunity. The district court denied summary judgment on both claims for all defendants. As to Montoya and Johnson, who fired the shots that killed Mono, the court reasoned that the "most important factor" in the Fourth Amendment analysis "is whether the suspect posed an immediate threat to the safety of the officers or others." (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (internal quotation marks omitted)). The court concluded that "there is a dispute of material fact as to

7

whether [Mono] actually brandished a weapon at the officers" and thus posed an immediate threat. As to Frey, Lind, and Carrington, who did not fire any shots, the court held that "[a] reasonable jury could infer from the circumstances that [they] were integral participants during the time when the allegedly violative applications of force occurred" and were therefore subject to potential liability. Finally, as to the familial-association claim, the court acknowledged some uncertainty as to the governing legal standard. It concluded that the facts could support application of a "deliberate indifference" standard and that there was a genuine issue of material fact as to whether the deputies acted with deliberate indifference.

The deputies appeal. We review de novo the district court's decision denying summary judgment on the basis of qualified immunity. *Estate of Lopez v. Gelhaus*, 871 F.3d 998, 1005 (9th Cir. 2017).

II

We first address whether Montoya and Johnson are entitled to qualified immunity on Peck's excessive-force claim, and we conclude that they are not.

A preliminary issue is the scope of our jurisdiction. Congress has given us appellate jurisdiction over "final decisions of the district courts," and ordinarily, an order denying a defendant's motion for summary judgment is not "final" and therefore is not immediately appealable. 28 U.S.C. § 1291; *see Plumhoff v. Rickard*, 572 U.S. 765, 771 (2014). But because qualified immunity is "an

8

immunity from suit rather than a mere defense to liability," the Supreme Court has treated an order denying qualified immunity as effectively final and thus subject to immediate appeal. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis omitted); *see Plumhoff*, 572 U.S. at 771–72.

That rule, however, has an important exception. We may review "the application of 'clearly established' law to a given (for appellate purposes undisputed) set of facts" to determine whether the facts establish a violation of a clearly established constitutional right, thus defeating qualified immunity. *Johnson v. Jones*, 515 U.S. 304, 313 (1995). But under *Johnson*, we may not review any "portion of a district court's summary judgment order that, though entered in a 'qualified immunity' case, determines only a question of 'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial." *Id.*

Distinguishing the two has perplexed courts for years. *See Estate of Anderson v. Marsh*, 985 F.3d 726, 732 (9th Cir. 2021); *id.* at 735–42 (W. Fletcher, J., dissenting); *Tuuamalemalo v. Greene*, 946 F.3d 471, 479–85 (9th Cir. 2019) (W. Fletcher, J., concurring); *Romo v. Largen*, 723 F.3d 670, 686 (6th Cir. 2013) (Sutton, J., concurring in part and concurring in the judgment). We have described the scope of our jurisdiction as limited to reviewing "whether the defendant[s] would be entitled to qualified immunity as a matter of law, assuming all factual disputes are resolved, and all reasonable inferences are drawn, in plaintiff's favor."

9

*George v. Morris*, 736 F.3d 829, 836 (9th Cir. 2013) (quoting *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1068 (9th Cir. 2012) (brackets in original)). But the distinction between making sure that only "reasonable inferences" are drawn (which we may do) and answering questions of "evidence sufficiency" (which we may not) is often difficult to discern. *See Estate of Anderson*, 985 F.3d at 735–42 (W. Fletcher, J., dissenting). Compounding the difficulty, in several cases after *Johnson*, the Supreme Court has resolved issues of qualified immunity in interlocutory appeals in which there was at least some dispute as to the relevant facts. *See*, *e.g.*, *Plumhoff*, 572 U.S. at 768; *Scott v. Harris*, 550 U.S. 372, 378 (2007).

Last year, in *Estate of Anderson*, we surveyed the case law and stated the rule as follows: A "public official may not immediately appeal a fact-related dispute about the pretrial record, namely, whether or not the evidence in the pretrial record was sufficient to show a genuine issue of fact for trial." 985 F.3d at 731 (internal quotation marks, citation, and emphasis omitted). In that case, the district court had denied summary judgment to an officer who shot the driver of a vehicle that the officer had stopped after a high-speed pursuit. *Id.* at 728–29. The officer stated that the driver had taken his hands off the steering wheel and made a sudden movement toward the passenger seat, as if trying to retrieve a weapon, but the district court determined that "a reasonable jury could conclude that [the

10

driver] did not make" such a movement. *Id.* at 730. On appeal, the officer challenged that determination, but we dismissed the appeal for lack of jurisdiction, reasoning that "rather than 'advanc[ing] an argument as to why the law is not clearly established that takes the facts in the light most favorable to [the plaintiff],' which we *would* have jurisdiction to consider, [the officer] contests 'whether there is enough evidence in the record for a jury to conclude that certain facts . . . are true,' which we do *not* have jurisdiction to resolve." *Id.* at 734 (quoting *George*, 736 F.3d at 835, 837 (first alteration in original)).

The rule in *Estate of Anderson* prevents us from considering many of Montoya and Johnson's arguments in this case. The district court found that there were genuine disputes of fact about whether Mono posed an immediate threat, and it concluded that when the facts were viewed in the light most favorable to the plaintiff, they were sufficient to make out a violation of clearly established Fourth Amendment law. In challenging that decision, the deputies attempt to evade *Johnson*'s jurisdictional bar by characterizing their arguments as legal ones directed at the materiality of disputed facts. But their efforts are poorly disguised. Insofar as the deputies argue that the evidence is insufficient to raise a genuine issue of fact, we lack jurisdiction to resolve those factual disputes.

For example, Montoya and Johnson challenge the district court's determination that there is a genuine factual dispute as to whether Mono was

11

moving toward the gun when the deputies fired at him. Although three deputies observed Mono moving toward the gun, Larry Berman, one of Mono's neighbors, observed that "seconds" before the shooting, Mono was moving away from the couch (and, consequently, the gun). The deputies contend that an observation seconds before the shooting is "immaterial" because it leaves too long a gap between what Berman saw and when the shots were fired. Thus, they insist that "the district court did not cite any evidence raising a genuine dispute" regarding Mono's movements at the critical moment. The probative value of Berman's observation may be debated, and perhaps—though we emphasize that we do not decide the question—there is room for disagreement about whether the record contains enough evidence to allow a jury to conclude that Mono was moving away from the gun at the time of the shooting. But that is precisely the kind of question that we may not review in an interlocutory appeal. *See Estate of Anderson*, 985 F.3d at 734; *George*, 736 F.3d at 835 (explaining that we lack jurisdiction over an interlocutory appeal presenting "the question whether there is enough evidence in the record for a jury to conclude that certain facts are true" (quoting *Kinney v. Weaver*, 367 F.3d 337, 347 (5th Cir. 2004) (en banc)).

The remainder of the deputies' challenges founder on the same jurisdictional bar. They contest the district court's determination that there are genuine disputes as to whether Mono grabbed or brandished the weapon and whether he was close

to the gun at all. Johnson asserts that he began firing "[a]s Mono grabbed the firearm," and Montoya asserts that he began firing as Mono "began raising the firearm toward deputies positioned outside the windows on the north side of the residence." But several facts, if believed, undercut that telling of events. The district court found that the deputies' stories contradict the ballistics report and each other. According to Peck's ballistics expert, the gun was recovered "180-degrees away" from where Montoya claimed the gun was located, and Mono must have been standing at least several feet away from the gun. Peck, likewise, did not observe a gun near Mono when she reached him after the shooting. Moreover, a jury might infer from the fact that the gun was recovered in its holster that Montoya could not have observed Mono raising it. And the ballistics expert concluded that "[t]he wound pattern to Mr. Mono attributed to bullets fired by Deputy Johnson [does] not support Deputy Johnson's version of the shooting." Again, whether that evidence is sufficient to create a genuine issue of material fact is not a question we can review. *See Estate of Anderson*, 985 F.3d at 732–33.

So, turning to the heart of the qualified immunity analysis, we must accept the district court's determinations that there are genuine disputes of fact and that a jury could find that Mono did not pick up the gun—and was not moving toward the gun—before he was shot. On those facts, Johnson and Montoya are not entitled to qualified immunity.

13

In resolving whether Montoya and Johnson are entitled to qualified immunity on summary judgment, we engage in a two-step inquiry. *Tolan v. Cotton*, 572 U.S. 650, 655 (2014) (per curiam). We first ask whether the facts, viewed in the light most favorable to the plaintiff, demonstrate that the deputies violated a constitutional right. *Id.* at 655–56. We then ask whether that right was "clearly established" at the time of the alleged constitutional violation. *Id.* The "rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (per curiam) (internal quotation marks omitted) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)).

"In evaluating a Fourth Amendment claim of excessive force, we ask whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021) (internal quotation marks omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). We evaluate, among other factors, (1) the "severity of the crime at issue," (2) whether the suspect "poses an immediate threat to the safety of the officers or others," and (3) whether the suspect "is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Of these, the "immediate threat to safety" factor is the most important. *See Rice*, 989 F.3d at 1121. But we must ultimately consider the totality of the circumstances "from the

14

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Drawing all reasonable inferences in Peck's favor, a jury could conclude that Montoya and Johnson fired at an unarmed man who, although in the presence of a gun, never picked it up and in fact was moving away from it when he was shot. We recognize that the deputies had received a 911 call about a potentially deadly encounter in which an individual had a weapon, and, once they arrived, that individual was behaving erratically and making statements that could be considered threats. But officers may not kill suspects simply because they are behaving erratically, nor may they "kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed." *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997); *accord Estate of Anderson*, 871 F.3d at 1011–12; *George*, 736 F.3d at 838; *Curnow ex rel. Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991). A fortiori, a jury might conclude that because Mono was *not* armed—and was not about to become armed—he did not "pose[] an immediate threat to the police or the public, so deadly force [was] not justified." *Cruz v. City of Anaheim*, 765 F.3d 1076, 1078–79 (9th Cir. 2014). A jury will have to decide what actually happened.

The deputies do not seriously question that legal principle. Instead, they invoke cases that describe the Fourth Amendment analysis applicable to situations

15

in which, as they put it, "the suspect suddenly advances toward and reaches for the firearm, presenting a threat of death or serious bodily injury." But as we have explained, the district court determined that a reasonable jury could find that the shooting at issue here did *not* occur in such a situation.

We have repeatedly distinguished between a suspect who is actively reaching for a weapon and a suspect who is armed but not reaching for the weapon. In *Cruz*, for example, officers confronted a suspected gang member during a traffic stop. 765 F.3d at 1077–78. The officers believed that the suspect was armed. Affirming the district court's denial of qualified immunity on summary judgment, we observed that "[i]t would be unquestionably reasonable for police to shoot a suspect in Cruz's position if he reaches for a gun in his waistband, or even if he reaches there for some other reason." *Id.* at 1078. "Given Cruz's dangerous and erratic behavior up to that point," we explained, "the police would doubtless be justified in responding to such a threatening gesture by opening fire." *Id.* But at the same time, we held that "if the suspect *doesn't* reach for his waistband or make some similar threatening gesture, it would clearly be unreasonable for the officers to shoot him." *Id. Cruz* establishes that officers may not fire at a suspect—even an armed suspect—absent some reason to believe that the suspect will soon access or use the weapon. And when viewing the facts in the light most favorable to the plaintiff, Mono was unarmed and not about to arm himself.

16

To be sure, the Fourth Amendment does not necessarily "require[] officers to delay their fire until a suspect turns his weapon on them," and "[i]f the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *George*, 736 F.3d at 838. But where, as here, a jury could find that no such movement occurred, our cases clearly establish that the use of deadly force would be impermissible. *Id.*; *accord Curnow*, 952 F.2d at 325; *Cruz*, 765 F.3d at 1079. We therefore affirm the district court's denial of qualified immunity to Montoya and Johnson at this stage of the litigation.

III

We turn next to whether Frey, Lind, and Carrington may be held liable for using excessive force. Those deputies did not themselves use excessive force, or indeed any force at all. But the district court held that they were potentially liable and not entitled to qualified immunity because they were "integral participants" in Montoya and Johnson's use of excessive force. We disagree.

Section 1983 imposes liability on "[e]very person who . . . subjects, or causes [a plaintiff] to be subjected . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." In some situations, the Constitution may impose on an officer a duty to intervene to prevent an ongoing constitutional violation. *See, e.g.*, *Koon v. United States*, 518 U.S. 81 (1996);

17

*Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000). But in general, one does not "subject" someone to a deprivation of a constitutional right—or "cause [someone] to be subjected" to such a deprivation—simply by watching others violate the Constitution. To be liable under section 1983, a defendant official "must be more than a 'mere bystander.'" *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 941 (9th Cir. 2020) (brackets omitted) (quoting *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1090 (9th Cir. 2011)). Under our cases, an official whose "individual actions" do "not themselves rise to the level of a constitutional violation" may be held liable under section 1983 only if the official is an "integral participant" in the unlawful act. *Id.* (citation and internal quotation marks omitted).

We have not previously "define[d] the minimum level of involvement for liability under the integral-participant doctrine," *Reynaga Hernandez*, 969 F.3d at 941, but our precedents have permitted liability in two situations: those in which (1) the defendant knows about and acquiesces in the constitutionally defective conduct as part of a common plan with those whose conduct constitutes the violation or (2) the defendant "set[s] in motion a series of acts by others which [the defendant] knows or reasonably should know would cause others to inflict the constitutional injury." *Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir. 1978); *accord Buck v. City of Albuquerque*, 549 F.3d 1269, 1279–80 (10th Cir. 2008); *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 560–61 (1st Cir. 1989).

18

Our decision in *Boyd v. Benton County* is illustrative of the first situation. 374 F.3d 773 (9th Cir. 2004). There, a group of officers executed a search warrant at a home; some provided armed backup while another unlawfully threw a flash-bang device inside. *Id.* at 780. We held that the backup officers were integral participants in the use of the flash-bang because "every officer was aware of the decision to use the flash-bang, did not object to it, and participated in the search operation knowing the flash-bang was to be deployed." *Id.* But that category of liability is fairly narrow, as demonstrated by our subsequent decision in *Hopkins v. Bonvicino*, in which we held that an officer who stood in the front yard of a house interviewing witnesses while other officers carried out an unlawful search was not an integral participant in that search. 573 F.3d 752, 770 (9th Cir. 2009). In so holding, we emphasized that the defendant had "participated in neither the planning nor the execution of the unlawful search." *Id.* In other words, simply being present at the scene does not demonstrate that an officer has acted as part of a common plan.

Our decision in *Reynaga Hernandez* illustrates the second situation. That case involved an arrest that was unlawfully conducted without probable cause. 969 F.3d at 941. We held that an officer who had ordered that the plaintiff be "picked up" was an integral participant in the unlawful arrest. *Id.* at 942. We explained that the plaintiff's detention was not only "a reasonably foreseeable consequence" but

19

"perhaps the only reasonable interpretation" of the officer's order. *Id.* In other words, the officer's order caused the unlawful arrest; the officer knew that the order would do so; and, because the officer had no basis for believing that there was probable cause, he also knew that the resulting arrest would be unlawful. *See also Nicholson v. City of Los Angeles*, 935 F.3d 685, 692 (9th Cir. 2019) (holding an officer liable as an integral participant in an unlawfully prolonged detention because he was "the initial officer who set the[] events into motion, and either instructed the other officers to arrest Plaintiffs or consulted with them in that decision" (emphasis omitted)).

Similarly, in *Blankenhorn v. City of Orange*, we held that an officer who did not himself use excessive force but who handcuffed a suspect—and, thus, facilitated another officer's subsequent unlawful act of applying "hobble restraints"—was an integral participant in that use of force. 485 F.3d 463, 481 n.12 (9th Cir. 2007). Although we did not expressly discuss the defendant officer's knowledge of whether hobble restraints would be applied, the close physical and temporal connection between the defendant's act and that of the other officer made it reasonable for a jury to infer that he knew what his fellow officer was about to do and intended to facilitate it. We therefore affirmed the denial of summary judgment to the defendant.

We recognize that in *Reynaga Hernandez* we left open the question "whether we import both proximate cause and but-for cause into our integral-participant doctrine," and we noted that *Blankenhorn* could be read to mean "that we require only but-for cause." 969 F.3d at 942. Picking up on that suggestion, the district court here reasoned that Frey, at least, could be deemed an integral participant because by speaking with Metzler he "put the process in motion" that ultimately led to the shooting—in other words, that he was a but-for cause of the shooting. But contributing to or facilitating a constitutional violation requires more than simply but-for causation, which is an extraordinarily expansive concept. *See United States v. George*, 949 F.3d 1181, 1187 (9th Cir. 2020) (explaining that "a but-for cause of a harm can be anything without which the harm would not have happened"). After all, "a but-for cause is not always (in fact not often) a cause relevant to legal liability." *United States v. Hatfield*, 591 F.3d 945, 948 (7th Cir. 2010); *see Holmes v. Securities Inv. Prot. Corp.*, 503 U.S. 258, 266 n.10 (1992). In this case, for example, a standard of pure but-for cause, not tied to the defendant's knowledge or intent, would subject to liability not only the non-shooting deputies at Mono's house, but also the 911 dispatcher who sent them to the scene, and, for that matter, the mechanic who fixed their cars so they could drive there.

Extending liability so broadly would be inconsistent with three principles that govern actions under section 1983. First, "vicarious liability is inapplicable to

21

*Bivens* and § 1983 suits," and therefore "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *see Keates v. Koile*, 883 F.3d 1228, 1242 (9th Cir. 2018); *Crowley v. Bannister*, 734 F.3d 967, 977 (9th Cir. 2013). In other words, "each Government official . . . is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677. It follows that liability may not be imposed based on a "team effort" theory that would "allow[] the jury to lump all the defendants together, rather than require it to base each individual's liability on his own conduct." *Chuman v. Wright*, 76 F.3d 292, 295 (9th Cir. 1996). Instead, "[f]or an official to be liable for another actor's depriving a third party of his constitutional rights, that official must have at least the same level of intent as would be required if the official were directly to deprive the third party of his constitutional rights." *Lacey v. Maricopa County*, 693 F.3d 896, 916 (9th Cir. 2012).

Second, the doctrine of qualified immunity, which limits individual liability in section 1983 actions, demands that the law be "clearly established" so that it would have been "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *City of Tahlequah*, 142 S. Ct. at 11 (quoting *Wesby*, 138 S. Ct. at 590). The Supreme Court "has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the

22

factual situation the officer confronts.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (alteration in original) (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)). Thus, the key question is "whether the violative nature of *particular* conduct is clearly established." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Liability requires at least enough individual involvement from each defendant to put him on notice that his conduct might reasonably lead to a constitutional violation.

Third, section 1983 "creates a species of tort liability" that incorporates common-law tort principles. *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976); *see also Wilson v. Garcia*, 471 U.S. 261, 277 (1985); *Carey v. Piphus*, 435 U.S. 247, 253–55 (1978). Courts therefore "turn to the causation factors developed in the common law of torts to supply the necessary causation factor in the civil rights field." *Stevenson v. Koskey*, 877 F.2d 1435, 1438 (9th Cir. 1989). At common law, a defendant is liable for the acts of another if the defendant "does a tortious act in concert with the other or pursuant to a common design with him, or," alternatively, "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." Restatement (Second) of Torts § 876 (1979). That standard does not permit the imposition of liability on a defendant who was unable to foresee that his conduct would lead to the commission of a tort.

23

Based on those principles, we conclude that an actor may be deemed to have "cause[d] [a plaintiff] to be subjected" to a constitutional violation, 42 U.S.C. § 1983, and thus to be an integral participant in the violation, only if (1) the defendant knew about and acquiesced in the constitutionally defective conduct as part of a common plan with those whose conduct constituted the violation, or (2) the defendant set in motion a series of acts by others which the defendant knew or reasonably should have known would cause others to inflict the constitutional injury.

Applying that standard, we easily conclude that Frey, Lind, and Carrington were not integral participants in Mono's shooting. The shooting was completely unplanned; there is no suggestion that Frey, Lind, and Carrington formed a plan whereby Montoya and Johnson would deploy excessive force. Nor did they have any reason to know that their actions—providing armed backup—would enable the later use of excessive force. Perhaps it was foreseeable that a shooting might take place when the deputies arrived on the scene of a 911 call about an encounter in which an individual had brandished a weapon and was behaving erratically. But Frey, Lind, and Carrington had no reason to know that an *unconstitutional* shooting would take place. The deputies received a report that a man was using a firearm to threaten others; it was not unreasonable—much less a constitutional violation—for them to treat the situation as a potentially hostile and dangerous

24

encounter, justifying their decision to surround the house with weapons drawn and establish a safety perimeter.

Peck identifies several ways in which the deputies may have deviated from best practices in the actions they took before the shooting. For example, Peck alleges that the deputies violated department policy by failing to speak with Heflin (who could have explained to them that Mono did not pose a threat) and by surrounding the house in an aggressive posture rather than retreating or awaiting backup. But that does not mean that they contributed to a *constitutional* violation.

Peck's reasoning is similar to the analysis that the Supreme Court rejected in *County of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1547 (2017). There, the Court emphasized that "[a]n excessive force claim is a claim that a law enforcement officer carried out an unreasonable seizure through a use of force that was not justified under the relevant circumstances. It is not a claim that an officer used reasonable force after committing a distinct Fourth Amendment violation such as an unreasonable entry." *Id.* Still less is it a claim that the officer used force after committing a policy violation that did not itself violate the Fourth Amendment. On Peck's theory, any policy violation would make an officer strictly liable for any subsequent constitutional violation by her fellow officers. That is not the law.

Because Frey, Lind, and Carrington did not form a plan to shoot Mono, nor did they set in motion acts by Montoya and Johnson that they knew or should have

known would cause a constitutional violation, Frey, Lind, and Carrington were not integral participants in the constitutional violation. The district court therefore erred in denying their motion for summary judgment on the excessive-force claim.

IV

Finally, Peck asserts that the deputies violated the Fourteenth Amendment by depriving her of her interest in the companionship and society of her husband, Mono. The deputies are entitled to qualified immunity on that claim because Peck has not established any constitutional violation, let alone a clearly established one.

The Due Process Clause of the Fourteenth Amendment provides that a State may not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Supreme Court has held that the clause guarantees not only fair process but also certain substantive rights. *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997) ("The Due Process Clause guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint."). But in *Graham*, the Supreme Court held that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." 490 U.S. at 395 (emphasis omitted). We have construed the Court's statement in *Graham* to limit only claims

26

brought by "the person who claims excessive force was directed at him," leaving open the possibility of substantive due process claims by a parent or child who claims "loss of the companionship and society" of the decedent. *Curnow*, 952 F.2d at 325; *see also Hayes v. County of San Diego*, 736 F.3d 1223, 1229–30 (9th Cir. 2013); *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013).

This case involves a familial-association claim asserted by a spouse, rather than a parent or child. We have not previously held whether a substantive due process right exists in that context, and other courts of appeals have reached conflicting conclusions. *Compare, e.g.*, *Griffin v. Strong*, 983 F.2d 1544, 1546–48 (10th Cir. 1993) (recognizing such a right), *with Harbury v. Deutch*, 233 F.3d 596, 607 (D.C. Cir. 2000) (declining to "extend a constitutional right to familial association to cases where . . . the government has indirectly interfered with a spousal relationship"), *rev'd on other grounds sub nom. Christopher v. Harbury*, 536 U.S. 403 (2002). Were we to confront the question, we would have to consider not only the language from *Graham* quoted above but also the standards of *Glucksberg*, which counsel caution in the extension of substantive due process rights. *See Glucksberg*, 521 U.S. at 720 (noting that the Court has "always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended"

27

(quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992)). We need not consider those issues, however, because even under our case law relating to familial-association claims asserted by parents and children, the claim here fails.

To determine whether a violation of substantive due process occurred, we look to whether the officers' conduct deprived Peck of her familial interest in a manner that "shocks the conscience." *Hayes*, 736 F.3d at 1230. That is a more demanding standard than the "reasonableness" test that governs excessive-force claims under the Fourth Amendment. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371–72 (9th Cir. 1998). And to determine, in turn, whether conduct shocks the conscience, we apply a more specific standard that varies depending on the circumstances in which the defendants acted. On the one hand, if the defendants confronted a situation in which "actual deliberation [was] practical," then their "deliberate indifference" to the harm they caused may be sufficient to shock the conscience. *Hayes*, 736 F.3d at 1230. We apply the deliberate-indifference standard when officials had "ample time to correct their obviously [wrongful conduct]," such as in Eighth Amendment prisoner-treatment cases or in wrongful-detention cases. *See Porter v. Osborn*, 546 F.3d 1131, 1139 (9th Cir. 2008). On the other hand, if the defendants had to make a "snap judgment because of an escalating situation," then their conduct does not shock the conscience unless they "act[ed] with a *purpose to harm* unrelated to legitimate law

28

enforcement objectives." *Hayes*, 736 F.3d at 1230 (emphasis added); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 836 (1998). We apply the purpose-to-harm standard when officials were required to make "repeated split-second decisions" about how best to respond to a risk, such as during a high-speed car chase or when confronting a threatening, armed suspect. *Porter*, 546 F.3d at 1139 (citation omitted); *see, e.g.*, *Lewis*, 523 U.S. at 853–54; *Hayes*, 736 F.3d at 1230.

Our decision in *Porter* is particularly instructive here. In that case, an officer responding to a report of an abandoned vehicle shot and killed the driver in the ensuing encounter. 546 F.3d at 1132–33. We emphasized that the five-minute incident forced the officer to confront "an evolving set of circumstances that took place over a short time period necessitating 'fast action.'" *Id.* at 1139 (quoting *Lewis*, 523 U.S. at 853). We rejected the suggestion that five minutes "was enough time for [the officer] to consider what he was doing before he acted," noting that "'deliberation' for purposes of the shocks the conscience test is not so literal a concept." *Id.* Even though, "logically," an officer might have been able to engage in some form of deliberation, we concluded that the purpose-to-harm standard applied. *Id.* at 1139–40 (citing *Lewis*, 523 U.S. at 851 n.11).

Although the encounter in this case took slightly longer, our observations in *Porter* are equally applicable here. Much of the encounter was spent in what the district court correctly characterized as a "stalemate." Only a few minutes elapsed

29

between when the deputies observed the firearm and when they opened fire, and mere seconds separated Johnson's commands that Mono not approach the gun and the fatal shots. To be sure, the initial 911 call alerted the deputies to the existence of a gun on the property. But mere knowledge that someone might have access to a gun does not necessarily entail knowledge of how he might use it. Once the deputies identified the gun, they were required to develop a concrete tactical response quickly, making repeated snap judgments and assessing Mono's every move. In such a fast-paced environment, deliberate action within the meaning of our cases was not possible.

Peck argues that the deputies made flawed tactical choices early in the encounter, thereby creating a more lethal environment. But the purpose-to-harm standard can apply even where "the officer may have helped to create an emergency situation by his own excessive actions." *Porter*, 546 F.3d at 1132; *see also Hayes*, 736 F.3d at 1230 (applying the purpose-to-harm standard to a lethal shooting even though the officers "could have potentially avoided the incident by obtaining more information about Hayes or requesting a psychiatric emergency response team . . . before entering the house").

Under the purpose-to-harm standard, Peck's claim fails because no showing of such a purpose has been made or even attempted. No evidence suggests that the deputies shot Mono for any other purpose than their (possibly mistaken) perception

30

of the need for self-defense. Consequently, there was no Fourteenth Amendment violation, and the deputies are entitled to qualified immunity on this claim.

**AFFIRMED in part and REVERSED in part; REMANDED.**

*Susan Peck v. Anthony Montoya*, No. 20-56413, 21-55411

SCHROEDER, Circuit Judge, Concurring in the Result:

The facts of this case constitute a tragedy of errors. Deputies standing outside the windows of his house, shot and killed Mono, a legally blind, elderly, and unarmed man experiencing a mental health crisis. The deputies were summoned to the scene by a 911 caller outside the house. The caller, having listened in on a conversation taking place inside the house and having heard Mono talk in a threatening way about a gun, hung up to call 911 before he could hear the conversation come to an amicable end.

Responding to the call, five deputies, armed and in uniform, headed directly to the house and stationed themselves at the windows, making no inquiry of the two witnesses outside, other than to confirm one was the 911 caller. Had the deputies spoken to the witness who had been inside the house, and who knew Mono well, the deputies probably would have learned the gun was not loaded and that Mono was not a threat. Instead, the deputies rushed to the windows without explaining who they were or why they were there. Plaintiff, the victim's wife, was on medication at the time and could not coherently explain the situation to the officers outside.

When one of the deputies saw the gun on a couch and highlighted it for the other deputies with his flashlight, the action prompted an angry response from

Mono. There is some dispute over whether Mono may have reached for the gun but there is no dispute that two of the five deputies then immediately shot and killed Mono. When the gun was later located at the scene, it was still in its holster, unloaded. In my view, in the events leading up to Mono's death, there is plenty of blame to go around.

We must deal, however, with a claim of excessive force against the deputies. Under our circuit law, an officer may use deadly force only where there is an immediate threat to the officer or to others. *See Cruz v. City of Anaheim*, 765 F.3d 1076, 1078-79 (9th Cir. 2014). The majority opinion holds that the deputies who shot Mono are not entitled to qualified immunity because, when the facts are viewed through the proper lens, which is the most favorable to the plaintiff, there was no immediate threat of harm to anyone. The deputies who used deadly force are not entitled to qualified immunity. The majority correctly recognizes this. So did the district court.

The more difficult question is whether the district court correctly held that the other three deputies, who did not shoot, should similarly be denied qualified immunity. Under our circuit law, where constitutional claims are brought against multiple officers connected to an investigation, we ask whether the officers were "integral participants" in the constitutional violation. *Reynaga Hernandez v.*

*Skinner*, 969 F.3d 930, 941 (9th Cir. 2020). I agree with the majority's conclusion that the non-shooting deputies are entitled to qualified immunity because under that standard, they were not "integral participants" in the use of excessive force.

The district court denied qualified immunity to the three non-shooting deputies, finding that they were integral participants in the investigation. The problem, however, is that the non-shooting deputies were not integral participants in the constitutional violation, which was the shooting itself. I therefore conclude the majority opinion correctly holds the three non-shooting deputies are entitled to qualified immunity.

That is all that the case is about. As part of its discussion of integral participation, however, the opinion adds an unnecessary discussion of but-for causation, apparently in order to cast doubt on its applicability in this circuit. This is an issue no party has briefed, the district court did not discuss, and that is not relevant to the question at hand. No one has suggested the non-shooting deputies may have been but-for causes of Mono's death. To the extent there may be an open question in our circuit about the applicability of but-for causation, the question should be answered in a case where the issue is raised.

Nor is it for us to opine on what the officers may have been thinking, or what they thought they were accomplishing when they stationed themselves at the

windows. Specifically, I can not accept the suggestion that we regard the purpose of what, at this stage, we must regard as rash and menacing actions on the part of the officers, was to create a "safety perimeter" around the outside of the house. *See* Majority Opinion at 25.

This is a tragic case for everyone involved. The issue of whether the shooting deputies should be held accountable for Mono's death is ultimately for a jury to determine. That is the result that flows from the majority opinion and the result in which I concur.